Mark A. Hutchison (4639)
Shannon R. Wilson (9933)
Ramez Ghally (15225)
HUTCHISON & STEFFEN, PLLC
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, NV 89145
Tel: (702) 385-2500
Fax: (702) 385-2086
mhutchison@hutchlegal.com
swilson@hutchlegal.com
rghally@hutchlegal.com

Paul D. Clement (Virginia Bar No. 37195) *(Pro Hac Vice Pending)*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Tel.: (202) 742-8900
paul.clement@clementmurphy.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| GREATER LAS VEGAS SHORT-TERM RENTAL ASSOCIATION; JACQUELINE FLORES; LOUIS KOORNDYK; ESTRELITA KOORNDYK; HAAN'S PROPERTIES LLC; LK'S PROPERTIES LLC; THOMAS M. MCKANNON, DEBRA HANSEN; JOHN HANSEN, TROY UEHLING; PHILIP JOHNSON; SAMUEL HANKINS; LISA HANKINS; 5402 PALM MESA LLC; and AIRBNB, INC.;<br><br>            Plaintiffs,<br><br>v.<br><br>CLARK COUNTY, a political subdivision of the State of Nevada, and AARON D. FORD, in his official capacity as Attorney General for the State of Nevada,<br><br>            Defendants. | Case No.:<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Greater Las Vegas Short-Term Rental Association, Jacqueline Flores, Louis Koorndyk, Estrelita Koorndyk, Thomas M. McKannon, Debra Hansen, John Hansen, Troy Uehling, Philip Johnson, Samuel Hankins, Lisa Hankins, and Airbnb, Inc. file this complaint against Defendants Clark County, Nevada Aaron D. Ford in his official capacity as Attorney General for the State of Nevada, and allege as follows:

## 1    NATURE OF THE CASE

1.      This suit challenges provisions of Clark County's short-term rental regulatory scheme and Nevada's Assembly Bill 363 ("AB 363") (codified in NRS 244.3531, *et seq.*) together, the "Challenged Provisions") on the basis that they unconstitutionally burden Plaintiffs' property and liberty rights guaranteed by U.S. and Nevada law.

2.      By imposing such burdens, the Challenged Provisions upend the Country's and Nevada's centuries-old commitment to property rights. To the founding generation, property was the bedrock upon which economic and personal liberties were built. The Framers understood that strong property rights served as a bulwark for individual liberty by providing a sanctuary within which Americans would be free from the prying eyes of government officials. And they provided a mechanism, building upon America's essential entrepreneurial spirit, for citizens to seek economic freedom by putting their property to productive uses.

3.      These principles are at the foundation of our enduring practice of short-term leasing. For centuries, Americans have leased their property to guests in search of a temporary abode for work, for leisure, or for the expression of constitutional liberties. This practice is borne out in case law describing a robust practice of leasing, but also historical and cultural studies that describe a vibrant practice of hosting and including guests in one's home on a short-term basis through short-term leases.

4.    The Challenged Provisions burden these fundamental rights and upend this enduring tradition by making it unduly burdensome, and in some cases impossible, for Plaintiffs and similarly situated Nevadans to operate their property as short-term rentals. They impose these burdens through an arbitrary and onerous labyrinth of interlocking regulations. For example, the Challenged Provisions:

- Appropriate property owners' fundamental rights to lease and to include others on their properties by enacting a byzantine licensing scheme that commences with a random lottery system and then effectively bans the majority of all residents from the opportunity to put their property to use as a short-term rental based on arbitrary requirements including any property governed by a home owner association unless the use is expressly permitted and limiting the number of licensees allowed to one percent of the total number of housing units within an established unincorporated area of the County;

- Require property owners to obtain a separate business license, in addition to a short-term rental license, and comply with an array of burdensome regulatory requirements, including stifling occupancy restrictions;

- Impose arbitrary limitations on how close short-term rental units—defined as residential lodging leased for thirty consecutive days or less, Clark County Code § 7.100.020(r)—can be to one another and ban any short-term rental within 2,500 feet of a resort hotel;

- Provide arbitrary exemptions for hotel-operated short-term rentals in residential properties, *id.* § 7.100.040(a)-(c);

- Empower local officials to engage in warrantless searches of short-term rentals; and

- Permit officials to impose excessive and selectively enforced fines for violations of these ordinances.

5.     The Challenged Provisions further encumber Plaintiffs' rights by imposing unlawful and burdensome requirements on platforms, such as Airbnb, that assist residents in getting their properties to the short term rental market.  While these requirements are directed at platforms, they also serve to further hamper individual property rights by throwing sand in the gears of the short-term rental market.  Under Clark County's short-term rental regime, Airbnb is forced to obtain a license in order to list properties in Clark County, and to agree to abide by a series of "duties" in order to obtain the license.  These require Airbnb to, for example, share sensitive and confidential information regarding *all* Clark County listings and hosts, on a monthly basis without appropriate legal process; and screen and monitor listings for short-term rental licenses, and delete listings whose license cannot be verified as valid.

6.     Individually, each Challenged Provision makes operating a short-term rental in Clark County unduly burdensome—and thereby independently infringe on property owners' rights. Together, they constitute an all-sides attack on the property and liberty guarantees protected by Nevada and U.S. law. Indeed, for many Clark County residents, the Challenged Provisions will make operating a short-term rental impossible altogether.

7.     As a result, the Challenged Provisions strip Plaintiffs of their core property rights to lease and to include others on their properties without just compensation; violate Plaintiffs' deeply rooted fundamental right to operate their homes on a short-term basis; and ignore an array of other constitutional and statutory guarantees including the rights to be free from unreasonable searches and seizures and excessive fines.

8.      In this way, the Challenged Provisions do not further legitimate land-use concerns but instead appear motivated by concerns that do not trump the constitutional rights violated by the regulation.   The County proclaimed it adopted its unconstitutional regulatory framework because "[t]he increasing number of short-term rental units in Clark County has diverted a noticeable portion of transient lodging away from traditional transient lodging establishments and has negatively impacted the revenue derived from such rentals to local governments and other agencies and beneficiaries of transient lodging taxes." *Id.* § 7.100.010(c).  This brand of economic protectionism is constitutionally suspect.  *See Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1064 (9th Cir. 2018).

9.      Because the Challenged Provisions impose unjustified and unconstitutional burdens on fundamental property and liberty interests, and do so for illegitimate, arbitrary, and irrational reasons, they violate both U.S. and Nevada law.

## 2      JURISDICTION AND VENUE

10.      Plaintiffs bring this action under 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the United States Constitution and under self-executing clauses of the Nevada Constitution to redress deprivations of the rights that it protects. *See Mack v. Williams*, 522 P.3d 434, 441–42 (Nev. 2022).

11.      This Court has original jurisdiction over this action because the matters in controversy arise under the U.S. Constitution. 28 U.S.C. § 1331. The Court also has original jurisdiction because this action seeks redress from the deprivation, under color of state law, of a right secured by a provision of the U.S. Constitution providing for equal rights of U.S. citizens. *Id.* § 1343. This Court has supplemental jurisdiction over the alleged state law claims because they so relate to the federal claims in the action of which the Court has original jurisdiction that they form part of the same case or controversy. *Id.* § 1367(a).

12.     Venue is proper in the District of Nevada under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this action occurred in this District and the properties at issue in this matter are located within the District.

13.     This Court has the authority to enter declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. It has the authority to enter injunctive relief pursuant to Federal Rule of Civil Procedure 65.

## 3     PARTIES

14.     Plaintiff Greater Las Vegas Short-Term Rental Association ("GLVSTRA") is a community-driven non-profit advocacy group that represents the interests of owners and patrons of short-term rental homes throughout the greater Las Vegas area, including unincorporated Clark County. The organization engages in tireless advocacy, community engagement efforts, and targeted litigation to ensure short-term rental regulations in Nevada are fair and constitutional.

15.     GLVSTRA has countless members who have standing to sue in their own right because they are injured by the burdensome requirements of Clark County's short-term rental ordinance and, by extension, Assembly Bill 363. First, GLVSTRA has members whose license applications have been denied or who are ineligible for licenses due to Clark County and Assembly Bill 363's unconstitutional restrictions. These members are therefore barred from using their properties as short-term rentals—stripping them of their fundamental rights. Second, GLVSTRA has members, such as Plaintiffs Jacqueline Flores and the Koorndyks, who have been granted licenses and therefore were and are subject to the law's onerous regulatory requirements. For example, Flores and the Koorndyks have been forced to submit to warrantless searches and physical incursions of their property and are under imminent threat of future warrantless searches.

16.     GLVSTRA's members have derived substantial benefits from serving as hosts. The practice of short-term renting allowed the Association's members to generate essential income

6

from their property, which in turn has allowed them to remain in their homes despite rising homeownership costs. In doing so, they have strengthened the local economy, which is heavily dependent on tourism, and generated both jobs and substantial tax revenue for the region.

17.    The interests GLVSTRA seeks to protect through this litigation—the constitutional property rights associated with short-term rentals—are central to the organization's core mission. And the claims and relief sought by GLVSTRA do not require participation by its absent members.

18.    GLVSTRA is also itself injured by the burdensome requirements of Clark County's short-term rental ordinance and, by extension, Assembly Bill 363.  GLVSTRA has suffered a reduction in membership and, as consequence, its operating budget.

19.    Plaintiff Jacqueline Flores ("Flores") has lived in Nevada for almost twenty years and serves as President and Director of GLVSTRA. She is highly engaged in issues affecting short-term rentals in Nevada and advocates for the rights and freedoms of property owners throughout Clark County. As President and Director, Flores works with public officials and community members on relevant public policy issues related to short-term rentals.

20.    Flores applied for and currently maintains an active license to operate a short-term rental in Clark County. In or about September 2022, Flores submitted her pre-application to use the home she owns at 8493 Moondance Cellars Court, Las Vegas, Nevada as a short-term rental. This got her into the lottery.  It took her roughly forty hours to pull together all the documentation necessary to draft and finalize her short-term rental application.  Without knowing whether she would ultimately receive approval, she was nevertheless required to and did obtain and maintain -- for the two years her application was pending -- an annual state business license, specialized and higher-cost short-term rental insurance, surveillance cameras, noise monitoring devices, notarized documents, and complied with still other code requirements, which cost her more than $5,000

during which time she had neither short-term rental income to offset the costs nor any guarantee she would ever receive such a license even if she complied with every requirement within her control. The County did not issue Flores a license until September 17, 2024, approximately two years after she had submitted her application, and only then after the County forced Flores to submit to a warrantless search of her home. Upon approval of her application, Flores paid $1,700 to receive the license. In all, the process cost her in excess of $7,000.

21.     Flores engages in short-term leasing to earn supplemental income, which she needs to afford her mortgage and to continue to live in Clark County. But Flores lives in fear that the County will rescind her short-term rental license pursuant to any number of the burdensome provisions imposed by the County and State. And she lives under the threat of random warrantless searches and invasions of privacy that the Challenged Provisions permit.

22.     Flores has been, and continues to be, injured by the burdensome requirements of Clark County's short-term rental ordinance and, by extension, AB 363. Indeed, to obtain her license, Flores was forced to comply with Clark County's onerous application requirements to operate a short-term rental and remains subject to the laws' burdensome regulatory requirements. Moreover, she was forced to submit to a warrantless search of her property and remains under imminent threat of random additional warrantless searches.

23.     Plaintiffs Louis and Estrellita Koorndyk (the "Koorndyks") are married Nevadans who have lived in Clark County for forty-five years. Louis is a retired veteran of the United States Navy. Estrelita is an executive assistant. Like Plaintiff Flores, the Koorndyks are both deeply involved in GLVSTRA: Louis is the organization's Treasurer, and Estrelita is its Secretary. They assist in organizing the group's meetings, communicating with group members and the public

about issues relating to short-term rentals, and advocate for fair and reasonable policies and regulations for short-term rentals in the region.

24.     The Koorndyks jointly acquired two properties located in unincorporated Clark County. Historically, they relied on short-term rental income to cover the cost of Louis' parents' assisted living facility and other critical needs.  When the County deemed short-term rentals 'illegal,' the Koorndyks were not just deprived of that income, they were fined more than $60,000 for operating a short-term rental.  Alternative, inferior, living arrangements were made for Louis' parents, but they were the only arrangement the family could afford.  Just a few months later, Louis' mother suffered a fall and she died; shortly thereafter, Louis' father, who suffered from dementia, also died.  Now, the family needs to supplement Louis's limited retirement income to pay for his own cancer treatment and to plan for Estrellita's care for when Louis is gone (his cancer is terminal, and Esrtrellita has Crohn's disease).  They would like to leave something behind for their only child.

25.     One of the Koorndyks' homes is located at 7373 Bermuda Island Street (the "Bermuda Island Street Property"). The Koorndyks purchased this property in April 2018 as an investment property they could use to operate as a short-term rental.

26.     Haan's Properties LLC (hereinafter, "Hann's Properties") is a Nevada limited liability company, formed November 6, 2021, whose principal place of business is Clark County, Nevada.  The Koorndyks originally took ownership of the Bermuda Island Street Property in their individual names, but transferred the property to Haan's Properties on September 7, 2023.  Louis Koorndyk is the sole member of Haan's Properties.  Haan's Properties began the process of obtaining a short-term rental license for the property soon after the County adopted its regulatory framework. The Koorndyks submitted a pre-application shortly after that process opened on

September 13, 2022.  They timely submitted their full application.  It was more than two years following the pre-application, on September 17, 2024, that Haan's Properties received a short-term rental license for this property.

27.    The application process was expensive and onerous. Haan's Properties spent more than $6,500 in the application process, including a business license (to be renewed annually), inspection fees, additional emergency equipment, security cameras, and noise recording devices and special insurance as required by the Challenged Provisions.

28.    The Challenged Provisions have been costly in other ways too. The Bermuda Island Street Property has five bedrooms, but, due to the arbitrary occupancy limitations imposed by the Challenged Provisions, the Koorndyks have had to turn away several bookings seeking to take advantage of the home's large capacity, costing them thousands of dollars in lost income. Moreover, they remain under constant, imminent threat of random warrantless searches.

29.    The Koorndyks' second property is located at 3370 Red Rock Street (the "Red Rock Street Property"). They purchased this property in March 2018 as an investment, hoping to use the Red Rock Street Property as a short-term rental as well.

30.    LK's Properties LLC (hereinafter, "LK's Properties") is a Nevada limited liability company, formed November 6, 2021, whose principal place of business is Clark County, Nevada. The Koorndyks originally took ownership of the Red Rock Street Property in their individual names but transferred the property to LK's Properties on September 7, 2023.  Louis Koorndyk is the sole  member of LK's Properties.

31.    LK's Properties, submitted its pre-application when the process opened and their full license application shortly thereafter. LK's Properties has paid more than $5,000 for application and licensing fees, insurance, and installing equipment and devices to bring their

property into compliance with the Challenged Provisions. Nearly three years after the pre-application process opened, this application remains pending per the County's on-line business license search.  However, the Challenged Provisions bar residents from holding more than one short-term rental license at a time, which means their application for the Red Rock Street Property will certainly be denied.

32.     The Koorndyks have been and continue to be injured by the burdensome requirements of Clark County's short-term rental ordinance and, by extension, AB 363. To obtain the license for the Bermuda Island Street Property, they had to spend thousands of dollars on fees and alterations to their home. They also remain subject to the laws' burdensome regulatory environment, which, among other things, prohibits them from operating their second investment property as a short-term rental in violation of their fundamental ownership rights to lease and to include others on this property.

33.     Plaintiff Thomas McKannon ("McKannon") is a retired business executive and veteran of the United States Air Force who resides in Virginia and plans to move to Nevada in summer 2025. McKannon is a member of GLVSTRA.  In October 2022, he and his wife purchased an investment property located at 352 Echo Road in Mount Charleston, Nevada (the "Echo Road Property") in unincorporated Clark County with the intention of renting the property out on both a short- and long-term basis. While McKannon wishes to obtain a license to operate his Echo Road Property as a short term rental, he is barred from doing so because the property is located in Mount Charleston, which is subject to a total ban on short-term rentals under the Challenged Provisions. He therefore did not apply for a license, as doing so would have been futile.

34.     Indeed, the County's online pre-application system prevents applicants from submitting an application if the entered address is in one of the unincorporated areas that bans

STRs (like Mt. Charleston) or is within 2,500 of a resort hotel. The on-line system prevented the applicant from proceeding further with the application process.

35.     The Challenged Provisions have forced McKannon to rent his home on a long-term basis only. Doing so has sharply limited the number of potential guests to whom he and his wife can rent and decreased the profits they can derive from their property, as the property is better situated for short-term rental opportunities. In this way, McKannon has been and continues to be injured by the burdensome Challenged Provisions, which have stripped McKannon of his fundamental ownership rights to lease and to include others on his property.

36.     Plaintiffs Debra and John Hansen (the "Hansens") are a married couple living in Nevada and members of GLVSTRA. The Hansens have jointly owned a residence located in unincorporated Clark County since 1980.  They have owned property located at 2225 Duneville Street in Las Vegas (the "Duneville Street Property") since 2010. Since 2011, the Hansens have rented their Duneville Street Property on a long-term basis as a means of generating income, first to support the special education costs and needs of their grandchildren and now to support their retirement and rising healthcare costs, including for their respective cancer treatments. But renting out their property on a long-term basis has been difficult and sharply limits the income they can generate from their property. For example, long-term tenants are sometimes late to pay or do not pay at all, which then requires eviction and the costs and complexities associated therewith.  The Hansens are diligent owners who have strict policies and a vested interest in ensuring they rent to individuals who will treat their home and neighborhood as if it were the renter's own.

37.     The Hansens submitted an application for a short-term rental license for their property in unincorporated Clark County, which has been pending for nearly three years and remains pending as of this filing.  They need to increase the income they can generate from their

property to support their continued retirement and medical care. They spent about forty-eight hours putting together all the documentation necessary to draft and finalize their short-term rental application. They also spent roughly $2,000 on making the necessary alterations to their home to comply with the Challenged Provisions, including the installation of noise monitoring and video surveillance devices. Despite the Hansens' substantial investments of time and money in their application, the County is almost certain to deny it because their property is located within 1,000 feet of another property which, as a result of the County's random number generator application process, is first in line to obtain a license.

38.    The Hansens have been and continue to be injured by the burdensome requirements of Clark County's short-term rental ordinance and, by extension, AB 363. The Challenged Provisions' arbitrary and onerous licensing scheme prevents the Hansens from exercising their fundamental right to lease out their property on a short-term basis and to include others on their property. As a result, the Hansens have suffered constitutional injuries and significant financial loss.

39.    Plaintiffs Samuel and Lisa Hankins are a married couple of 31 years who reside in Hawaii and purchased a property to supplement their retirement savings. Samuel is a schoolteacher and Lisa works in accounting for an insurance company. The Hankinses ensured that they satisfied all applicable requirements when they submitted their application to obtain a short-term rental license for 5435 Chestnut Street (hereinafter, the "Chestnut Street Property"). Nonetheless, by notice dated March 24, 2025, their application was denied under Clark County Code § 7.100.080(f)(2) because another applicant received a short-term rental license for a property located within 1,000 feet of the Chestnut Street property.  The same notice also stated, "Please be advised that your application is denied based on deficiencies identified in the

application materials . . . . The reasons for denial checked above are not exhaustive and additional reasons for denial may be identified upon physical inspection and continued investigation." They have never been advised of any other violation or deficiency. The Hankinses requested an administrative appeal; during that hearing they did not contest that their property is within 1,000 feet of the property identified in the denial letter; following that hearing, the denial was sustained on May 20, 2025.

40. The Hankinses have been, and continue to be, injured by the arbitrary and burdensome requirements of Clark County's short-term rental ordinance and, by extension, AB 363. The Challenged Provisions prevent the Hankinses from operating a short-term rental and exercising their fundamental ownership rights to lease and to include others on their property. As a result, they have suffered constitutional injuries and significant financial loss as well as damage to their investment-backed expectations when purchasing the property.

41. Plaintiff Troy Uehling ("Uehling") is a self-employed father of four children who lives in Colorado. Uehling is a member of GLVSTRA. He owns a home located at 4600 University Center Drive, Unit 260 (the "University Drive Property") in unincorporated Clark County. He has never lived in Nevada but invested in the University Drive Property to generate income from short-term rental arrangements. Nevertheless, Uehling is barred from obtaining a short term rental license under the Challenged Provisions because his property is located within 2,500 feet of a hotel.

42. Uehling attempted to complete the County's short-term rental pre-application process, but when he entered his property address into the system, it flagged the property as being within 2,500 feet of a resort hotel, and the system would not allow him to proceed further. There was no opportunity for appeal.

43. Uehling's property is a few feet from the boundary of a resort hotel on the strip and surrounded by other commercial businesses.

44. Uehling has been, and continues to be, injured by the burdensome requirements of Clark County's short-term rental ordinance and, by extension, AB 363. The Challenged Provisions prevent Uehling from operating a short-term rental and exercising his fundamental ownership rights to lease and to include others on his property. As a result, he has suffered constitutional injuries and significant financial loss as well as damage to his investment-backed expectations when purchasing the property.

45. Plaintiff Philip Johnson ("Johnson") is a Nevada resident and member of GLVSTRA. Johnson, a real estate owner and transportation planner, acquired property located at 4502 Palm Mesa Drive (hereinafter, the "Palm Mesa Property") in January 2022.

46. 4502 Palm Mesa LLC (hereinafter, "Palm Mesa LLC") is a Nevada limited liability company whose principal place of business is Clark County, Nevada. Johnson originally acquired the Palm Mesa Property in his individual name but transferred the property to Palm Mesa LLC on June 10, 2024. Philip Johnson is the sole member of Palm Mesa LLC.

47. Like the other Plaintiffs, Johnson submitted a pre-application and incurred costs, estimated in excess of $6,000, to comply with the application process. Johnson received a place in the lottery system. However, Johnson and Palm Mesa LLC, collectively, received three separate fines for alleged violations of the Code. He paid the first two fines of $850 and $1,500, issued to Johnson on May 4, 2024 and May 11, 2024 for violations of County Code § 30.03.01(C)(3). The third fine of $44,500, issued to Palm Mesa LLC on September 27, 2024 for violation of County Code § 7.100.030, he could neither afford to pay nor challenge because to appeal a citation the

recipient must remit, as a deposit, the amount of the fine along with their request for hearing. Clark County Code § 1.14.070. These fines are excessive, totaling more than $45,000.

48.     Johnson cannot get confirmation of the status of his application. There are no other applicants within 1,000 feet of the Palm Mesa Property, nor is there any resort hotel property within 2,500 feet. Johnson is informed and believes he met all requirements for a license. Yet, the County's system shows conflicting information. On the one hand, the Code Enforcement Department lists the application as "Failed – Rejected," and on the other hand the Business License Department, Short-Term Rental page lists it as "Pending."

49.     Johnson is informed and believes the County intends to make these fines a Special Assessment which will be placed on the tax rolls, subjecting his property to foreclosure.

50.     Johnson has been and continues to be injured by the burdensome requirements of Clark County's short-term rental ordinance and, by extension, AB 363. The Challenged Provisions prevent Johnson from operating a short-term rental and exercising his fundamental rights to lease and to include others on his property. Moreover, Defendants' fine provisions have foisted excessive fines for more than $45,000 on Johnson that, in addition to exacting a significant financial penalty, bar him from operating a short term rental—a fundamental and longstanding property use that has existed since at least the founding. Johnson has accordingly suffered grievous constitutional injuries and significant financial loss because he cannot operate a short-term rental.

51.     Plaintiff Airbnb, Inc. ("Airbnb") maintains a website and mobile applications that provide access to an online marketplace for people to list, explore, and book both short-term and long-term accommodations. With an Airbnb account, a host seeking to rent their property may create a listing for rent, and a guest seeking a rental may request to book a property. Guests and hosts may communicate with each other on Airbnb, including through direct messages. When

guests and hosts access their profiles on Airbnb, they are able to access a variety of data stored by Airbnb on their behalf, including information about past and upcoming bookings, old and current messaging threads, and user reviews.

52.    Airbnb allows hosts like its co-plaintiffs to share their homes with travelers from around the world, and provides those travelers with a diverse array of options for accommodations, to the benefit of hosts, travelers, and Nevada itself.  For example, in 2024, Airbnb contributed $1.8 billion to Nevada's GDP, supported 17,900 jobs in the state, and generated $470 million in tax revenue.  *See* Airbnb, Inc., *Guest spending boosts US economy by a record $90 billion in 2024* (May 29, 2025), https://tinyurl.com/2npnb77b. And many hosts in Clark County depend on the extra income they earn from hosting to make ends meet. According to a 2024 survey of Airbnb hosts in Clark County, nearly 50% confirm hosting on Airbnb has helped them stay in their home and 63% say hosting on Airbnb allows them to meet rising costs of living.

53.    Defendant Clark County is a political subdivision of the state of Nevada, organized under the Clark County Code, created by and operating under the laws of the State of Nevada and pursuant to Nev. Rev. Stat. Ann. § 12.105.  Clark County, under AB 363, is tasked with "adopt[ing] and enforc[ing]" the ordinances that make up the Challenged Provisions. Nev. Rev. Stat. Ann. § 244.353545(1).

54.    Defendant Aaron D. Ford is the Attorney General of the State of Nevada and is sued in his official capacity. He is charged with the statutory authority to enforce Nevada law, including AB 363, through his authority to commence and defend suits "to protect and secure the interest of the State." Nev. Rev. Stat. Ann. § 228.170(1).

**4    STATEMENT OF FACTS AND LAW**

**I.    Americans have been operating short-term rentals from the very founding.**

55.    The right to lease one's home has long been a core property right. Indeed, the

practice of leasing one's property to others predates the founding of this country. Roman law recognized leasing as part of a property owner's right to make productive use of their land. *See* Sally Brown Richardson, *Reframing Ameliorative Waste*, 65 Am. J. Comp. L. 335, 348 (2017). And under the common law, property owners sold each other "uses," allowing owners to convey property temporarily to another person who would care for and manage it. Avisheh Avini, *The Origins of the Modern English Trust Revisited*, 70 Tulane L. Rev. 1139, 1140 (1996).

56.    The modern practice of leasing to guests on a short-term basis is simply the latest iteration of this long-standing tradition that has been around for as long as property rights have been recognized. Therefore, Plaintiffs seek to vindicate rights that would have been, and are, deeply familiar to the founding generation and the many generations of Americans since.

A.    **Property rights stand as a bulwark for individual liberty**

57.    Property rights were central to the guarantees the founding generation sought to protect by ratifying the Constitution. The historical record makes clear that what motivated early Americans on this score was not just a desire to protect individuals' economic freedom—though that was critical—but also an appreciation that a strong conception of property rights was essential to the guarantee of individual liberty.

58.    As one academic has put it:

> We know that private property was a central institution of the European civil law tradition that started with the Roman law of Justinian, and of the English common-law tradition that started with the Norman Conquest. We know that the protection of private property from the Crown was a major purpose of the Magna Carta as early as 1215 . . . And we know that centuries later, the key writers who set the intellectual framework for our Constitution—John Locke, David Hume, William Blackstone, Adam Smith, and James Madison—all treated private property as a bulwark of the individual against the arbitrary power of the state.

Richard Epstein, *Supreme Neglect: How to Revive Constitutional Protection for Private Property*, 5–6 (2008). Or as a British jurist, influential to the Framers, put it more simply "a man's house is

his castle." Sir Edward Coke, *The Third Part of the Institutes of the Laws of England* 161–62 (1644).

59.    Indeed, the Framers and the legal philosophers and scholars who preceded them, conceived of property rights as a "bundle of sticks—a collection of individual rights which, in certain combinations, constitute property." *United States v. Craft*, 535 U.S. 274, 278 (2002) (internal quotation marks omitted). These rights implicated by property ownership include both traditional property-based prerogatives, such as the authority to put one's property to productive uses and to include and exclude others from one's land, and corollary liberty interests associated with property ownership, such as the rights to privacy and of association.

60.    As to the bundle of rights comprising property itself, our legal tradition has long recognized that it includes "the right to use, lease and dispose of [property] for lawful purposes." *Terrace v. Thompson*, 263 U.S. 197, 215 (1923); 1 W. Blackstone, Commentaries on the Laws of England 134 (1765) ("[P]roperty . . . consists in the free use, enjoyment, and disposal of all his acquisitions . . . ."). Judicial decisions roughly contemporaneous with the founding and ratification of the Fourteenth Amendment bear out this nationwide consensus. *See, e.g.*, *Pelletreau v. Jackson ex dem. Varick*, 11 Wend. 110 (N.Y. Sup. Ct. 1833) (discussing rental property let to tenants beginning around 1782 or 1783); *Herbert v. Wren*, 11 U.S. (7 Cranch) 370 (1813) (describing rents earned from property leased in 1794); *Alexander v. Harris*, 8 U.S. (4 Cranch) 299 (1808) (pertaining to a landlord's action to recover rent); *Faw v. Marsteller*, 6 U.S. (2 Cranch) 10 (1804) (adjudicating a debt action to recover rent under a 1779 lease); *City of New York v. Hill*, 13 How. Pr. 280, 281 (N.Y. Sup. Ct. 1856) (City of New York had right to lease because it had "the right of possession and enjoyment" over the property); *Kimball v. Yates*, 14 Ill. 464, 465–66 (Ill. 1853) (recognizing "right to exclude the public, or any portion of the public, from the privilege of passing

over his premises"). So too does the common law, under which property owners sold each other "uses," allowing owners to convey property temporarily to another person who would care for and manage it. Avisheh Avini, *The Origins of the Modern English Trust Revisited*, 70 Tulane L. Rev. 1139, 1140 (1996). As scholars have concluded, the right to control how and on what terms people enter one's property is a practice "ubiquitous across cultures," which "[a]nthropologists and ethnographers have documented . . . all over the world and throughout history." Daniel B. Kelly, *The Right to Include*, 63 Emory L.J. 857, 871 (2014).

61.    The Framers enshrined these property rights in our Constitutional structure. Evidence from the founding era demonstrates that it was almost certainly the right to lease and its accompanying property rights that the Framers had in mind when drafting protections for "private property" in the Takings Clause. *See Tyler v. Hennepin County*, 598 U.S. 631, 638 (2023) (courts "draw[] on existing rules or understandings about property rights" when interpreting and applying the Takings Clause, such as "traditional property law principles" and "historical practice." (internal quotation marks omitted)); *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) ("The right to exclude is 'one of the most treasured' rights of property ownership." (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982))).

62.    Protection of the "bundle of sticks" that comprises property rights also furthers the protection of individual liberties implicated by a robust conception of property rights. The founding generation held a strong appreciation for the connection between protecting property rights and the ability to safeguard individuals' privacy, free association, and autonomy, as they experienced firsthand the effects of the British Crown's trampling of such rights. *See Payton v. New York*, 445 U.S. 573, 601 (1980) (observing that "[t]he overriding respect for the sanctity of the home" traces back to the "origins of the Republic").

63.    Indeed, by the time the First Congress convened in 1789, the freedom to associate guaranteed by the First Amendment, the ban on the forced quartering of soldiers protected by the Third Amendment, and the prohibition on unreasonable incursions on one's privacy protected by the Fourth Amendment were all firmly fixed in our constitutional order as a means of further facilitating the protections of private property from government intrusion.

64.    The United States Supreme Court has recognized this tradition in its constitutional jurisprudence. Over and again, the Court has made clear that the home serves as a place "where privacy expectations are most heightened," *California v. Ciraolo*, 476 U.S. 207, 213 (1986), and as a space where Americans are free to engage with, learn from, and order their lives around whomever they choose, and where owners and guests are similarly entitled to "reasonable expectation[s] of privacy," *Florida v. Jardines*, 569 U.S. 1, 11 (2013). Justice Ginsburg perhaps put it best when she eloquently observed that the Court's "decisions indicate that people have a reasonable expectation of privacy in their homes in part because they have the prerogative to exclude others. The power to exclude implies the power to include." *Minnesota v. Carter*, 525 U.S. 83, 106 (1998) (Ginsburg, J., dissenting) (citation omitted)); *see Minnesota v. Olson*, 495 U.S. 91, 95–100 (1990).

65.    In short, America's legal tradition speaks clearly: from the very founding, the Framers and early jurists understood the Constitution to guarantee the property rights of individuals, including their right to lease and the right to include others on the owner's property, even on a short-term basis, as a means of unlocking the full value of their land. And they understood that the Constitution would equally safeguard a host of individual liberties that could not be exercised without a robust conception of one's control over one's property.

**B. Americans have long exercised their right to lease their property on a short-term basis.**

66.    Consistent with this legal tradition, short-term leasing arrangements have been a feature of American life from the founding.

67.    The practice of taking in boarders and temporary lodgers was so widely practiced throughout our history, that the practice of temporary letting was regularly referred to by its opponents as an "American institution." Wendy Gamber, *Tarnished Labor: The Home, The Market, and the Boardinghouse in Antebellum America*, 22 J. of the Early Republic, 177, 178 (2002)

68.    This history begins with the Constitution itself. Gouverneur Morris, known as the "penman" of the United States Constitution because he wrote much of its text, stayed at a boarding house operated by Morris Dalley while drafting parts of the Constitution. Morris was not alone— receipts from this period show that he was joined at Ms. Dalley's boardinghouse by other Framers seeking temporary lodging, including Samuel Adams.

69.    Leasing arrangements of all sorts have had a prominent role in the nation's political life. During the early years of the Republic, short-term rentals emerged as the residency of choice in Washington, D.C. for politicians who principally resided elsewhere. Many of those officials shared space in boarding houses, which fostered interactions that helped bridge partisan divisions. Indeed, so deeply embedded was the tradition of home-sharing in our nation's culture and conception of community that, when faced with deepening divisions within the fledgling Supreme Court, Chief Justice John Marshall conceived a simple plan to forge consensus: he directed all the justices to share living quarters at the same boardinghouse in Washington at a rate of $15 per week.

70.    And abolitionists, depending upon the nation's traditional legal guarantee that one's home remains free from prying eyes and official interference, operated boardinghouses throughout

the antebellum era. In fact, after the Civil War, Harriet Tubman continued this tradition of boarding travelers seeking more hopeful lands by operating a boarding house in Auburn, New York. All told, historians estimate that by the end of the nineteenth century between 20% and 33% of households took in boarders. Another scholar estimates that in 1900, roughly 25% of U.S. households contained a lodger and almost "as many more took one in at some point in the life of the household." Richard Harris, *The Flexible House: The Housing Backlog and the Persistence of Lodging, 1891-1951*, 18 Soc. Sci. Hist. 31, 31 (1994).

71.    This ubiquitous practice was not confined to a specific socioeconomic class or demographic. To the contrary, boarding houses were run and used by people from every walk of life.

72.    But there's no avoiding that short-term rental opportunities were and are especially useful for those for whom "[r]enting out extra space was a necessity . . . to make ends meet, and the scarcity of housing options made boarding a realistic option." Emily M. Speier, Comment, *Embracing Airbnb: How Cities Can Champion Private Property Rights Without Compromising the Health and Welfare of the Community*, 44 Pepp. L. Rev. 387, 392 (2017). Indeed, this early practice of Americans leasing their homes reflected the reality that property owners could reap substantial economic benefits by treating their "living space as a[] [valuable] exchange commodity." David Faflik, Boarding Out: Inhabiting the American Literary Imagination 1840-60, 40 (2012). And "many households increasingly [took] to board[ing] as an added (and sometimes necessary) source of revenue. It was simple supply and demand: independent householder . . . had domestic space to let; the homeless needed homes." *Id.* Indeed, this practice became a crucial steppingstone for immigrants seeking to build a life in a new land. *See* Susan L. Richards, *Making*

*Home Pay: Italian and Scottish Boardinghouse Keepers in Barre, 1880-1910*, 74 Vt. Hist. 48, 51–52 (2006); Gamber, *supra*, at 178.

73.    The practice of leasing one's home continued deep into the 20th century. As one scholar put it, "boarding and lodging . . . pervaded American family life . . . throughout the nineteenth and early twentieth century." Paul Groth, *Living Downtown: The History of Residential Hotels in the United States.* 92 (1994).

74.    The law recognized this reality. Judicial decisions and statutory law from the Founding era and the mid-19th century bear out this lived experience by depicting a vibrant use of boarding houses as a natural aspect of life. *See, e.g.*, *Curley v. Dean*, 4 Conn. 259 (1822) (discussing a weekly tenancy); *Jackson ex dem. Russell v. Rowland*, 6 Wend. 666 (N.Y. Sup. Ct. 1831) (noting that a dwelling-house tenant held a weekly tenancy); *Pelletreau*, 11 Wend. at 110 (discussing a rental property that had been let to tenants beginning around 1782 or 1783); *Reeves v. Dougherty*, 15 Tenn. (7 Yer.) 222 (1834) (noting that a building lease also boarded with the defendants via a weekly tenancy); *President, Dirs. & Co. of Bank of U.S. v. Hatch*, 31 U.S. 250, 254 (1832) (finding notice properly provided at boarding house); *Rafferty v. New Brunswick Fire Ins. Co.*, 18 N.J.L. 480, 484–85 (N.J. 1842) (finding insurance agreement remained valid after dwelling was used as a boarding house); *see also Bayley v. Merrill*, 92 Mass. (10 Allen) 360, 360–61 (Mass. 1865) (interpreting statute concerning liens boarding house keepers could place on baggage in their houses); *Smedes v. Wild*, 7 How. Pr. 309, 310–11 (N.Y. Sup. Ct. 1852) (usury dispute concerning boarding house).

75.    Given this longstanding historical practice, it would have been obvious to Americans of the 19th and 20th centuries that banning or unduly restricting temporary rentals, including short-term rentals, would impose unfamiliar and unconstitutional burdens on property,

privacy, and associational rights. Short-term leasing thus served as a primary means by which Americans of all walks of life could exercise their freedoms that helped bind the nation together, ensuring a freer flow of travel and commerce.

## II. Nevada Has a Proud Tradition of Protecting Property Rights

76.    Nevada is home to the same robust history and tradition of protecting fundamental property rights.

77.    Before Nevada was even a state, the promise of economic prosperity and the acquisition of public land through various land acts drew farmers and ranchers intent on improving the land in exchange for entitlement to the property. From this dependence and reverence for the land and its resources came a deep respect for, and protection of, individual property. Thus, the first article in Nevada's Constitution—unanimously agreed to by the otherwise fractious delegates of Nevada's Constitutional Convention—promises the "Inalienable right[]" of "Acquiring, Possessing and Protecting property." Nev. Const. art. 1, § 1. As the Nevada Supreme Court has explained, "the protection of a landowner's inalienable rights to acquire, possess and protect private property" is the very "first right established in the Nevada Constitution's declaration of rights," for which there is "no corollary provision in the United States Constitution." *McCarran Int'l Airport v. Sisolak*, 137 P.3d 1110, 1126 (Nev. 2006). And modern-day Nevadans voted overwhelmingly, twice (once in 2006 and again in 2008), to amend the state constitution to increase protections for private property owners and limit the government's power to exercise eminent domain.  Nev. Const. Art. 1, Sec. 22.

78.    It is therefore unsurprising that Nevada "enjoys a rich history of protecting private property owners against government takings" and "contemplates expansive property rights in the context of takings claims." *Id.* at 1126–27. And these broad protections extend to "all [fundamental] rights inherent in ownership, including the right to possess, use, and enjoy

property," as well as the "right[s] to control and dispose of property," which necessarily encompass the fundamental rights to lease and to include others on one's property. *Hamm v. Arrowcreek Homeowners' Ass'n*, 183 P.3d 895, 902 (Nev. 2008), *abrogated on other grounds by Saticoy Bay, LLC v. Peccole Ranch Cmty. Ass'n*, 495 P.3d 492 (Nev. 2021); *accord Jones v. Ghadiri*, 546 P.3d 831, 835 (Nev. 2024) ("The holder of valid title is vested with all property rights, including the right to *exclusively control* the property . . . .").

79.     Nevada's rich history adds to the background tradition in which the state was born, making abundantly clear the state's commitment to property rights and the personal liberties they ensure.

### III.     The Benefits of Short-Term Rentals

80.     It is no surprise that the Country's short-term leasing practice has endured for so long—short-term rentals are a tremendous boon for property owners, guests, and local communities alike.

81.     *First*, short-term leasing arrangements allow property owners to put their land to productive use and to unlock the full value of their property, creating opportunities for homeownership and economic freedom that would otherwise be unreachable for countless people.

82.     *Second*, by facilitating tourism and creating local jobs, short-term rentals stimulate local economies. This is especially important for Nevada and Clark County, whose economies depend mightily on tourism. And unlike hotels, which tend to be clustered in a handful of neighborhoods, short term rental listings are located in a wide range of neighborhoods, including those that would not otherwise benefit from tourism, which broadens the number of communities that can enjoy in these benefits.

83.     *Third*, short-term rentals support state and local governments by generating tax and

fee revenue.[1]

84.    *Fourth*, short-term hosting benefits consumers by providing low-cost lodging options—supporting consumer choice, affordability, and competition. This benefit is especially important for those in need of flexible housing such as those facing life transitions, families whose relatives are in health care facilities, disaster victims, and essential workers. Short-term rentals also provide important "surge capacity" for special events that significantly contribute to Clark County and Nevada's economy. A recent article estimated that in ten major U.S. cities, "consumer surplus," that is, the improvement in consumer welfare from having more options at lower prices, "would decrease by $305 million" in one year without Airbnb. Chirara Farronato & Andrey Fradkin, *The Welfare Effects of Peer Entry: The Case of Airbnb and the Accommodation Industry*, 112 Am. Econ. Rev. 1782, 1785 (June 2022).

85.    *Fifth*, by making travel easier and more accessible short-term leasing supports America's enduring interest in binding together a geographically and ideologically diverse country. This is especially true for Americans who have historically faced exclusion from desirable destinations for whom short-term rentals have provided opportunities for travel that were previously non-existent. *See, e.g.*, Speier, *Embracing Airbnb*, *supra*, at 392 (emphasizing the importance of short-term boarding as a "realistic option" for low-income guests and workers); Paul Groth, *Living Downtown*, *supra*, at 94 (same for Black Americans who were "excluded" from "most hotels" at the time).

---

[1]    *See    Short-Term    Rental    Unit,    FAQs*,    Clark    County, https://www.clarkcountynv.gov/business/doing_business_with_clark_county/divisions/regulated_business/short_term_rentals/frequently_asked_questions.php#collapse391626b2.

### IV.    Nevada and Clark County Upends this Historical Tradition

86.    For decades, Clark County—Nevada's most populous county and home to the Las Vegas Strip—unconstitutionally prohibited short-term rentals in its unincorporated territory.

87.    Instead of cracking down on Clark County's ban as a clear violation of federal and state constitutional protections, which it was, the Nevada Legislature passed Assembly Bill 363 in 2021, a law that while prohibiting Clark County from outright banning short-term rentals, imbues the County with the broad authority to adopt protectionist measures meant to render operating a short term rental within the County's borders difficult and in some cases impossible.

88.    Like the County, the motivations of the legislation's sponsors were clear: economic protectionism. During debate on AB 363, the President of the Nevada Resorts Association, who originally had hoped to continue the ban on short-term rentals,[2] "participate[d] in presenting" the bill and testified that legislation was necessary to recoup "millions of dollars in lost tax revenue" from hotel room taxes.[3] The state legislature responded accordingly: Assemblywoman Nguyen, Assembly Bill 363's primary architect, stated to the Committee on Revenue in an April 2021 meeting that the law seeks to "protect our resorts and neighborhood gaming companies."[4] The new law proposed to do just that by, among other things, creating a minimum distance requirement of 2,500 feet between any short-term rental and a resort hotel—essentially banning short-term rentals in large swaths of Clark County—and by excluding short-term rentals in residential properties that are owned and operated by hotels from the law's grasp.

---

[2] Minutes of the Meeting of the Senate Committee on Revenue and Economic Development, 13 (May 29, 2021), https://www.leg.state.nv.us/Session/81st2021/Minutes/Senate/RED/Final/1434.pdf.

[3] Minutes of the Meeting of the Assembly Committee on Revenue, 7–8 (Apr. 29, 2021) https://www.leg.state.nv.us/Session/81st2021/Minutes/Assembly/REV/Final/1078.pdf.

[4] *Id.* at 6.

89.     But not all legislators saw things the same way. Assemblyman David Orentlicher, for example, questioned the rationality of a buffer requirement between short-term rentals and resorts. He "underst[ood] why resorts do not like the competition" but simply could not see a legitimate purpose for the distance requirement—indeed Nevada lets "restaurants spring up nearby resort hotels and that is competition for the in-house restaurants."[5]

90.     Ultimately, these concerns were dismissed, and the final version of the law included a number of measures meant to shield the state's hotel industry, including the 2,500-foot minimum distance requirement between any short-term rental "and a resort hotel." *See* Nev. Rev. Stat. Ann. § 244.353545(2)(f)(2). The law also provides that Clark County must require its residents to obtain a license before operating a short-term rental, mandates a minimum distance of 660 feet between any two short-term rentals, imposes a two-night minimum rental period for non-owner-occupied rentals, and requires that short-term rentals have a "local representative" available at all times. *Id.* §§ 244.353545(2)(b), (e)(2), (f)(1), (k); 244.35356(5)(c). AB 363 did not, in the President of the Resorts Association's words, "create[] a level playing field."[6] It inscribed into law a permanent advantage to resort hotels and casinos over ordinary Nevada property owners.

91.     But AB 363 did not impose these limitations uniformly on all STRs. Nevada provided a special exemption for short-term rentals owned by hotels and casinos. <u>See</u> NRS 244.35351(2).  Everyday Nevadans, including Plaintiffs, who wish to operate the very same short-term rentals, are subject to the full brunt of the law.

---

[5] *Id*. at 14.

[6] *Id.* at 8.

92.     Following the state legislature's cue, Clark County, forced by Assembly Bill 363 to lift its complete short-term rental ban, capitulated in name only. On June 21, 2022, the County adopted Chapters 7.100 and 7.110, a complex short-term rental regulatory framework.

93.     The final regulatory scheme adopted by the County, discussed in more detail below, imposes sweeping burdens on residents who wish to offer short-term rentals. For some, the Challenged Provisions constitute a flat prohibition on their ability to exercise their fundamental property rights. For others, they impose an undue burden on their ability to freely exercise their right to lease. But just like the state, the County took care to exempt the hotel and casino industry from its regulatory reach. Timeshares and vacation homes, some of which are operated by hotels, are exempted under the County ordinance. Clark County Code § 7.100.040(a)-(c). In other words, Clark County has impermissibly and unconstitutionally appropriated the fundamental property rights of a significant proportion of owners' property rights.

94.     To add insult to injury, Clark County has slow-rolled the processing of short-term rental licenses applications—delaying compliance with Assembly Bill 363. The County began its preapplication process in September of 2022.[7] But as of August 2024, more than two years after Clark County overturned its ban, the County had issued only *three* short-term rental licenses.[8] As of October 2024, hundreds of applications remained unprocessed.[9] On information and belief, as

---

[7] Short-Term Rental Unit Pre-Application Process, https://www.clarkcountynv.gov/business/doing_business_with_clark_county/divisions/regulated_business/short_term_rentals/preapplication.php.

[8] Jaclyn Schultz, *Clark County issues a handful of short-term rental licenses, hundreds still waiting*, FOX5 (Aug. 21, 2024) https://www.fox5vegas.com/2024/08/21/clark-county-issues-handful-short-term-rental-licenses-hundreds-still-waiting/.

[9] Christopher Alvarez, *With 10,000 short-term rentals, most in Las Vegas are operating illegally*, Nevada Pub. Radio (Oct. 3, 2024) https://knpr.org/show/knprs-state-of-nevada/2024-10-03/with-10-000-short-term-rentals-most-in-las-vegas-are-operating-illegally.

of the filing of this Complaint, fewer than 200 short-term rental licenses have been issued by Clark County.

**IV.    *Greater Las Vegas Short-Term Rental Association I* Litigation**

95.    Soon after Chapter 7.100 was enacted, GLVSTRA challenged the constitutionality of the law in Nevada state court and sought a preliminary injunction ordering the County to cease efforts to enforce the law.

96.    In February 2023, the Nevada trial court partially granted the preliminary injunction, enjoining the enforcement of eleven provisions of Chapter 7.100 on the grounds that those components were unconstitutionally vague or overbroad. In doing so, the court recognized that the relationship between host and guest implicates a range of constitutionally protected freedoms, including due process, the right to privacy, freedom against unreasonable searches and seizures, and freedom of association. The County subsequently appealed.

97.    After the trial court issued its decision, but before the matter was decided on appeal, Clark County enacted a new ordinance amending nine out of the eleven provisions that had been declared unconstitutional.[10] The County, however, left in place the same essential unconstitutional regulatory structure of its first ordinance, as required by AB 363.

98.    On appeal, the Nevada Supreme Court dismissed GLVSTRA's lawsuit for lack of standing; importantly, the Court did not reach the merits of GLVSTRA's claims. As a practical matter, this means that the entirety of amended Chapter 7.100 remains in full effect.

**V.    The Challenged Provisions**

99.    This lawsuit seeks to enjoin, individually and collectively, the provisions that comprise amended Chapter 7.100, Clark County Code § 7.100.010 *et seq.*, and Chapter 7.110,

---

[10] It left untouched only two of those provisions, both of which related to fines for short-term rental violations.

Clark County Code § 7.110.010 *et seq.*, as well as the parts of AB 363 that require the County to adopt those regulations, Nev. Rev. Stat. Ann. § 244.35351 *et seq.* The Challenged Provisions require property owners to submit their fundamental ownership rights to arbitrary eligibility criteria that bans whole swaths of the County from exercising their fundamental rights to lease and to include others on their properties on a short-term basis, imposes strict buffer requirements preventing property owners who live too close to each other from exercising their fundamental property rights as well as their constitutional liberties, forces Nevadans to submit to warrantless searches, imposes arbitrary and selectively assessed fines for violations of these provisions, and, to add insult to injury, exempts hotels entirely from these restrictions. Moreover, these provisions impose unlawful demands on Airbnb and similar platforms, which ultimately result in additional burdens on individuals' constitutional rights.  These include the requirements to divulge sensitive and confidential information without the provision of legal process and to verify the licensing status of short-term rentals prior to publishing a listing or facilitating a booking. These burdens are unjustified, deviate from the long-standing practice of owners engaging in short-term lease arrangements, appropriate fundamental property rights, and encroach upon fundamental constitutional liberties and statutory law.

### A.    Arbitrary Eligibility Limitations

100.    First, the Challenged Provisions flatly deny large classes of Clark County residents their fundamental ownership rights to lease and to include others on a short-term basis by barring them from applying for a license because of where they live or the type of home they own. For example, residents living in the Town of Mt. Charleston (as well as several other listed townships) are barred from operating short-term rentals no matter their ability to otherwise comply with Defendants' regulatory scheme. Clark County Code § 7.100.080(c)(1).

101. Moreover, Defendants bar short-term rentals from operating in a multi-family dwelling if doing so will result "in more than ten percent of the residential units in the multifamily dwelling being rented for the purposes of transient lodging," prohibit anyone from operating a short-term rental in a dwelling that is not lawfully connected to a municipal wastewater system, and ban short-term rentals in common-interest communities, "unless the governing documents of the community expressly authorize the rental of a residential unit for the purpose of transient lodging." *Id.* § 7.100.080(d), (e); *see also* Nev. Rev. Stat. Ann. §§ 244.353545(2)(d); (2)(h). In other words, by default, residents who live in communities governed by a homeowners' association are banned from operating short-term rentals unless their respective associations decide to *affirmatively* permit short-term rentals within the community, despite the long-standing and well-established fundamental right of property owners to create short-term leases if they so choose.

102. Even if a potential host happens to live in the right kind of home in the right kind of place, they may yet still be barred from leasing their homes on a short-term basis because the Buffer Requirements further limit which property owners may hold a license. Specifically, property owners may not lease their properties on a short-term basis if they are "within 1,000 feet of any [other] short-term rental unit" or within 2,500 feet of a resort hotel. Clark County Code § 7.100.080(f).

103. Finally, only 1% of the County's total number of housing units may be operated as a short-term rental at a given time, Clark County Code § 7.100.050, sharply limiting residents' eligibility. In other words, the County has decreed by legislative fiat that owners cannot exercise their fundamental ownership right to lease and to include others on a short-term basis in more than 1% of the housing units throughout the county. This massive destruction of fundamental property rights is as constitutionally problematic as it is unprecedented.

**B.    Licensing Scheme**

104.    If a would-be host manages to survive the Challenged Provisions' onerous eligibility requirements, they must then navigate Defendants' labyrinthine double licensing scheme—all to exercise rights that inhere in their ownership of their properties. To operate a short-term rental in Clark County, a property owner must obtain (and maintain through annual renewals) a valid short-term rental license. Clark County Code §§ 7.100.030; 7.100.130; *see also* Nev. Rev. Stat. Ann. §§ 244.35355(1)(a); 244.35356. Under the Code only "those natural persons, business entities, or personal or family trusts identified as the owner(s) of the residential unit" may apply for and obtain a license. *Id*. § 7.100.060.  And once licensed, the Code sharply limits the ability for residents to sell or transfer their property.  The Challenged Provisions prohibit residents from transferring ownership of their short-term rentals except in circumstances of marriage, divorce, or death. *Id*. at § 7.100.150.

105.    Assuming they fall within the list of persons eligible for a license, a resident must then submit an application, just for approval to exercise fundamental rights incident to their ownership of property. A complete application requires a resident to identify a raft of personal information, including the address of the residential unit, the number of bedrooms it contains, the name, date of birth, mailing address, telephone number and email address of each owner of the residential unit, the name of all rental platforms that will be used to advertise the short-term rental, the name and contact information of a local representative responsible for the short-term rental, and finally provide a notarized signature. *Id*. § 7.100.090(b). Upon receipt of the application, the County may "screen applications for completeness," but the County is not required to notify an applicant their application is deemed incomplete.  § 7.100.100(f)  Each application must be accompanied by a $45 fee. *Id*. § 7.100.090(c).

106.    In addition to satisfying these requirements, a person who wishes to operate a short-term rental must pay an annual licensing fee of $750 for units with three or fewer bedrooms and $1,500 for units with more than three bedrooms. *Id.* § 7.100.120. And a County resident cannot be issued more than one short-term rental license no matter how many eligible properties they own, thereby barring property owners from exercising their fundamental ownership rights at all of their properties. *Id.* § 7.100.070(a).

107.    Finally, without regard for the size of the home, the Challenged Provisions limit the "maximum occupancy" of short-term rentals to be "the lesser of two person per bedroom or ten persons per residential unit," sharply stifling Plaintiffs' ability to freely associate within the protected privacy of their properties. *Id.* § 7.100.160(a). They also impose a two-night minimum stay on short-term rentals even though no such limitations exist for hotels and casinos, *id.* § 7.100.160(b) ("The licensee must not accept bookings of fewer than two nights per booking."); *but see* Nev. Rev. Stat. Ann. § 244.353545(2)(e) (permits owner-occupied rentals of one night or more; requires non-owner occupied rentals be a minimum of two nights), and they restrict licensees from accepting more than one booking for a residential unit during the same booking period, no matter how many rooms the residential unit possesses, Clark County Code § 7.100.160(c).

108.    Short-term rental operators also are required to "designate a local representative responsible for the rental and available to respond to the short-term rental unit within thirty minutes during all times that the property is rented or used on a transient basis." *Id.* §§ 7.100.170(d); 7.100.190(b); *see also* Nev. Rev. Stat. Ann. § 244.35356(5)(c). Licensees must "make available to the department a local twenty-four hour phone number that provides the capabilities of producing a response to complaints" and the local representative must respond within thirty minutes to a complaint and must address the complaint within "sixty minutes." *Id.* §§ 7.100.170(e);

7.100.190(c). Defendants' regulatory reach extends even to insurance. It provides that each "licensee must maintain general liability insurance coverage with limits of not less than five hundred thousand dollars per occurrence." *Id.* § 7.100.170(c); *see also* Nev. Rev. Stat. Ann. § 244.35356(5)(b). And even after complying with these requirements, a licensee must obtain a separate business license issued by the State of Nevada, which is subject to its own regulatory scheme, before being issued a short-term rental license by Clark County. *Id.* § 7.100.170(*1*); *see also* Nev. Rev. Stat. Ann. § 244.35355(1)(b). In other words, residents must be licensed not once *but twice* before operating a short-term rental.

109.    The burdens imposed by the Challenged Provisions' array of interlocking regulatory hurdles is exacerbated by the County's implementation of a lottery system.  Clark County Code § 7.100.100(g).  License applications are not reviewed on a first-come basis. Rather they are placed in a random order of priority by a number generator.[11] Accordingly, whether an applicant is barred from exercising their fundamental property rights comes down to chance. If, for example, a would-be host's application is reviewed after the application of a short-term rental within 1,000 feet of their short-term rental or after the County hits its 1% cap on short-term rentals, they will be prohibited from leasing their home on a short-term basis, even if they are otherwise eligible.

110.    In other words, Clark County has created an entirely arbitrary system for deciding who may exercise their fundamental property rights.

---

[11] https://www.clarkcountynv.gov/news_detail_T28_R753.php.

**C.    Surveillance Provisions**

111.    In addition to constraints on who can operate a short-term rental, the Challenged Provisions include a collection of ordinances designed to surveil short-term rental operators and their guests.

112.    Prior to the issuance of a short-term rental license, an owner must submit upon 48-hour notice "to inspection or code compliance review by any county agency or department to ensure the residential unit's compliance." Clark County Code § 7.100.100(h). Short-term rental operators remain subject to random inspections at the whim of county officials even after obtaining a license conditioned on the same 48-hour notice and inspections each year as part of their license renewal process. *Id*. §§ 7.100.200(b), 7.100.170(i)(2), 7.100.130(c).

113.    On top of these inspections, each "licensee must maintain adequate and accurate books and records that provide a true accounting of all financial transactions for the three preceding years, which must remain open to inspection by the department during normal business hours or made available to the department at a location within the county for the purpose of ascertaining compliance with" the code. *Id*. § 7.100.170(p). And unless provided by a hosting platform, *see infra* ¶105, each licensee must submit a monthly report that includes: (1) the number of bookings, listings, and lessees for the month; (2) the average number of bookings per listing; (3) current year-to-date booking value; (4) current year-to-date revenue collected; (5) the average length of a rental; (6) booking value per rental; (7) actual length of stay per address per rental transaction; and (8) the names of all platforms used to list the rental unit. *Id*. § 7.100.170(f). Moreover, the Code also permits officials to (1) "[d]emand that the licensee produce or make available all records required by this chapter during normal business hours or at a location within the county; and (2) [c]onduct an audit of the financial statements and operations of the business." *Id*. § 7.100.200(c).

114.     The Code also demands that short-term rental operators install invasive surveillance devices on their property. The County demands that each licensee "install a functional street-facing security camera capable of recording video surveillance" the footage of which must be provided to the county or any law enforcement agency upon request within 48 hours. *Id*. § 7.100.170(o).

115.     Similarly, the scheme requires licensees to "install noise monitoring devices at each property line in both the front and rear yard of the short-term rental unit, as well as in the vicinity of any outdoor pool or spa" and the noise level data captured by the device must be provided to the County or any law enforcement agency upon request within 48 hours. *Id.* § 7.100.170(r).

116.     Not only do both of these provisions compel the property owners to suffer physical intrusions on their properties, but they also foist obligations on private parties to collect and share information with government officials to facilitate their law-enforcement efforts.

**D.      Fine Provisions and Selective Enforcement**

117.     Further, the Challenged Provisions impose excessive penalties for violations of its terms. Operating a short-term rental without a valid permit is subject to a steep fine of between $1,000 and $10,000 which "shall be determined only after taking into account, without limitation, the severity of the violation, whether the person who committed the violation acted in good faith, and any history of previous violations." *Id.* § 7.100.230(d)(1)(I).

118.     For all other violations, "a fine equivalent to the nightly rental value" or $500 for the first violation and $1,000 for each subsequent violation can be levied, whichever is greater. *Id*. § 7.100.230(d)(1)(II).

119.     These fines are substantial on their own. But the Code provides "that penalties and remedies shall be cumulative," and citations must assess a "daily fine amount for each day the violation continues." *Id*. §§ 7.100.230(b); (d)(1); (e)(1). Moreover, the County presumes "that a residential unit or room within a residential unit is being operated as a short-term rental unit for

each day that the residential unit or room within the residential unit is listed, advertised, brokered, or offered for the purpose of transient lodging." *Id.* § 7.100.230(e)(3).

120.    Together, these provisions allow Defendants to impose eye-watering fines. And they use those excessive fines to gatekeep residents' access to administrative review. The Challenged Provisions bar residents from appealing an adverse enforcement action without first providing an "advanced deposit of the fine." *Id.* § 1.14.070. Accordingly, residents subject to Defendants' excessive fines are barred from receiving their due process before acquiescing to Defendants' unconstitutional penalties.

More serious still is the threat of foreclosure. Section 7.100.220 declares that short-term rentals – licensed or unlicensed – found to be in violation of the Code are a public nuisance. *Id.* § 700.100.220(a-b). Section 7.100.230(f)(4) gives the County the right to abate violations of the code as a public nuisance or chronic nuisance. By declaring violations a public nuisance, the County can then use NRS Chapter 244 to levy a "special assessment" against the property. NRS 244.3605(5). Special assessments are ultimately placed on the tax rolls and delinquency subjects the owner to foreclosure. *See*, NRS 244.360(4).

121.    The fines are made worse still by Defendants' selective and arbitrary enforcement of the Challenged Provisions as alleged in the foregoing statement of facts, and by Section 7.100.230(f)(1) of the Code, which provides that violations of the County Code could subject hosts and guests to the "issuance of a misdemeanor citation," transforming the Code into a penal regulation that was neither contemplated nor authorized by AB 363. *See,* NRS 244.353545(2)(n); *see also* NRS 244.353545(8).

*       *       *

122.    The Code is not limited to the deficiencies discussed above and on which this suit rests. As a few illustrative examples, the Code: provides that Clark County may "determine[]"

when licenses are available, without imposing any objective criteria for this determination, § 7.100.100(a); requires license applicants to "cooperate fully with any inspection," while leaving the determination of whether an applicant has done so to Clark County's unfettered discretion, § 7.100.110(a)(3); prohibits the residence from being used for "any purpose other than for dwelling, lodging, or sleeping and for activities that are incidental to its use for dwelling, lodging or sleeping," § 7.100.180(a); restricts rentals to individuals "within the same family or group," § 7.100.160(1)(c), and prohibits "a gathering of people with [*sic*] that exceeds the maximum occupancy of the residential unit established by this chapter and listed on the short-term rental license," without defining the term "gathering," §§ 7.100.180(b); 7.100.020(n); see also NRS 244.353545(2)(k); requires that a placard be affixed to the exterior of the property, at least eight by eleven inches in size and display in at least seventy-two (72) point font the complaint hotline number, the unit's maximum occupancy, and both the business and short-term rental license numbers, § 7.100.170(q); sets an arbitrary one percent (1%) cap on available short-term rental licenses in Clark County, § 7.100.150; and requires a short-term rental licensee to designate a Clark County resident as a local representative who can be available and physically present at the property within thirty (30) minutes notice, day or night, § 7.100.170(d).  In these and other ways outlined in this suit, the Code unduly imposes onerous restrictions on short-term rentals and deprives hosts of their constitutional rights.

### E. Platform Requirements

123.    Finally, the Challenged Provisions further burden property owners' rights by imposing unlawful requirements on short-term rental platforms such as Airbnb, leveraging those platforms to enforce the County's unconstitutional laws.

124.    The Code, pursuant to AB 363, prohibits any person from operating as an "accommodations facilitator"—defined to include "hosting platform[s]"[12]—without first obtaining a business license, with a price tag of up to $75,000 per year.  *Id.* § 7.110.030, 060. Without a license, Airbnb is prohibited from engaging in its business in Clark County, and its co-plaintiffs are cut off from Airbnb's platform.  To obtain a license, the platform must agree to "abide by" the burdensome and unlawful "duties and requirements" set forth in Chapter 7.110 of the Code. *Id.* §§ 7.110.040.

125.    First, the Code demands that Airbnb divulge troves of sensitive and confidential data to the County on a monthly basis (the "Monthly Report Requirement").  This requirement demands data about *each and every listing in Clark County*, including, for example, the owner's name and address, the "booking value per rental," and "*any other information as the department may deem necessary.*"  *Id.* § 7.110.080(e) (emphasis added).  Platforms must also provide confidential information about listing and booking activity in the County, including, for example, the "current year-to-date booking value for the county," the "current year-to-date revenue collected through the licensee from all rentals in the county, disaggregated by owner or lessee," and "*any other information as the department may deem necessary.*"  *Id.* § 7.110.080(f) (emphasis added). In practice, the County has issued document subpoenas pursuant to NRS 244.4545(4)(6) and Code sections 7.100.200 and 7.110.100, that demand all advertising, web site listings including but not limited to license reservations, occupancy, payment history, business records, and communications between host and guests.

---

[12] "'Accommodations facilitator' means a person, other than the owner, lessee or other lawful occupant of a residential unit, or a manager of a residential unit, who, for a fee or other charge, brokers, coordinates, makes available or otherwise arranges for the rental of a short-term rental unit. The term includes, without limitation, a hosting platform." *Id.* § 7.100.020(a).

126.    Plaintiffs consider the Monthly Report and property owner data to be private. Plaintiffs currently do, or will if they are able, list short-term rental properties on Airbnb.  For them, this data includes their personal identifying information, the level of activity in their homes, and their livelihoods.  For Airbnb, it reflects non-public and competitively sensitive information that drives key investment, marketing, and other business decisions within the company.

127.    Second, the Code requires Airbnb to monitor, delete, and refrain from publishing listings for unlicensed short-term rentals.  This mandate comes in the form of several obligations imposed on platforms under the Code (collectively the "Verification Requirements"):

- "Before listing or advertising" a short-term rental, platforms must "verify" that the property "has been issued a valid unexpired short-term rental license," prohibiting platforms from publishing un-verifiable properties, *id.* § 7.110.080(a);

- Platforms must "[d]eactive all listings which lack a valid state or county business license number," effectively mandating the deletion of such listings, *id.* § 7.110.080(c); and

- Platforms cannot "accept or facilitate the payment" of an unlicensed short-term rental, again effectively demanding the deletion of unlicensed listings, *id.* § 7.110.090.

128.    These and other requirements imposed on platforms under Chapter 7.110 of the Code amount to unreasonable and unlawful impositions on Airbnb, and in turn on persons seeking to rent their property on a short-term basis. The consequences of violating these onerous requirements are significant:  The Code provides for steep fines of $500 for the first infraction and $1,000 thereafter, to be assessed separately for each violation and daily for continuing violations.

*Id.* § 7.110.120(c)(3). Moreover, the County may suspend or revoke a platform's license for any violation of the Code. *Id.* § 7.110.110.

129. At bottom, the demands imposed on platforms like Airbnb will make it even more difficult for Plaintiffs—and all other property owners in the County—to exercise their rights and liberties guaranteed by the U.S. and Nevada constitutions. While Chapter 7.110 was adopted in June 2022, it could not be enforced to date given the dysfunction plaguing the County's issuance of short-term rental licenses. On April 23, 2025, the Department of Business License notified Airbnb by letter that it intends to enforce the platform requirements in Chapter 7.110 beginning September 1, 2025.

*    *    *

130. Individually and collectively, these restrictions severely burden and unconstitutionally impinge on Plaintiffs' ability to exercise their fundamental ownership rights to lease their properties on a short-term basis. First, Plaintiffs must navigate complicated and sweeping eligibility requirements that outright ban short-term rentals in large swaths of the County, including in common-interest communities whose governing documents do not expressly allow for short-term rentals—all requirements that contravene property owners' constitutional rights by blatantly disregarding that leasing is a fundamental right inherent in property ownership. If they are fortunate enough to manage those restrictions, then they must negotiate not only Defendants' licensing scheme, which imposes a dizzying array of regulatory hurdles, but also the State's separate business licensing framework. And even if they satisfy both gatekeeping regimes, Plaintiffs are then subject to a random lottery system that conditions their right to operate a short-term rental on chance and must pay substantial sums to meet the requirements of the application process with no guarantee they will get a license to offset the expense. Along the way, Plaintiffs must submit to warrantless searches and physical intrusions on their land, collect information to

facilitate law enforcement efforts, comply with stifling occupancy limitations, and make themselves vulnerable to excessive fines that are selectively assessed. These restrictions, to which the County and State have offered the hotel industry arbitrary exemptions, constitute gross infringements upon Plaintiffs' constitutional guarantees. On top of that, the County imposes burdensome and unlawful requirements on platforms like Airbnb, with an eye toward using these platforms to enforce the County's law. The effect is to further hamper property owners' liberties and rights guaranteed by the U.S. and Nevada constitutions.

## 5    CLAIMS FOR RELIEF

### COUNT I
#### Per Se Taking of Property Without Just Compensation
**U.S. Const. amends. V, XIV; 42 U.S.C. § 1983**
**By all Plaintiffs against all Defendants**

131. Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

132. The Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. const. amend. V. The Fifth Amendment's prohibition on taking private property for public use without just compensation applies to the States through the Fourteenth Amendment to the Constitution of the United States.

133. This clause reflects the Founders' recognition "that the protection of private property indispensable to the promotion of individual freedom." *Cedar Point Nursery*, 594 U.S. at 147. As the Supreme Court has long explained, "[b]y requiring the government to pay for what it takes, the Takings Clause saves individual property owners from bearing 'public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 273–74 (2024) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

134.    The Takings Clause's protections are triggered by per se takings and regulatory takings. Per se takings occur whenever government interference with property effects "a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). For per se takings, "the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery*, 594 U.S. at 147.

135.    The test in the regulatory-takings context, by contrast, involves balancing several "factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id*. at 148. But this balancing test, first announced in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 124 (1978), has "no place" when the government "appropriates for the enjoyment of third parties" "a fundamental element of the [owners'] property right," *id*. at 149, or "otherwise interfere[s] with [such fundamental] right[s]," *Sheetz*, 601 U.S. at 274. "That sort of intrusion on property rights is a per se taking" that automatically "trigger[s]" the "right to compensation." *Id.*

136.    The Challenged Provisions constitute per se takings, as they appropriate fundamental property rights owners hold by virtue of their property ownership: the right to lease their property and the right to include others on the property on a short-term basis. Over a century ago, the Supreme Court emphasized that "the Constitution protects" "the right to . . . lease," as an "essential attribute[] of property." *Terrace*, 263 U.S. at 215, and is one of the "fundamental rights which are the essence of civil freedom," *Civil Rights Cases*, 109 U.S. 3, 22 (1883). This accords with the expansive property protections Nevada law affords to "all [fundamental] rights inherent in ownership, including the right to possess, use, and enjoy property," as well as the "right[s] to control and dispose of property," which necessarily encompass the fundamental rights to lease. *Hamm*, 183 P.3d at 902; *accord Calcasieu Lumber Co. v. Harris*, 13 S.W. 453, 454 (Tex. 1890)

("The ownership of land, when the estate is a fee, carries with it the right to use the land in any manner not hurtful to others; and the right to lease it to others, and therefore derive profit, is an incident of such ownership.").

137.    For this reason, the government cannot appropriate the right to lease without an award of just compensation. *See, e.g.*, *United States v. Petty Motor Co.*, 327 U.S. 372 (1946) (formal condemnation action in which the United States sought to utilize a leased building for three years thereby taking the lessee's entire leasehold interest); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 380 (1945) (formal condemnation action in which the United States sought to take occupancy for the remainder of the lessee's lease term); *see also Kohl v. United States*, 91 U.S. 367, 377–78 (1875) (noting that, in a lessee's challenge to a federal condemnation action taking a parcel of land for a courthouse, all owners of estates or interests in the land could seek recovery for the appropriation of their property, but that the court would ascertain the value in one trial proceeding).

138.    In other words, like other "essential sticks in the bundle of rights that are commonly characterized as property," the right to lease—a fundamental incident of ownership in its own right—merits the Takings Clause's protections. *See, Cedar Point Nursery*, 594 U.S. at 150.

139.    The Challenged Provisions therefore effect *per se* takings by denying certain unlicensed property owners, like Plaintiffs McKannon, the Hansens, and Uehling, as well as many of GLVSTRA's members, the right to lease their own properties. And they effect *per se* takings by preventing property owners, like Plaintiffs the Koorndyks, from exercising their fundamental right to lease not only their first, but all their properties on a short-term basis, because the Challenged Provisions unconstitutionally prohibit property owners' from using more than one property to offer short-term rentals.

140.    Plaintiffs intend to lease their properties in Clark County to short-term guests but cannot do so due to the Challenged Provisions' various restrictions on which property owners can offer short-term leaseholds—*i.e.*, these short-term leaseholds are barred because (1) the owner's property is physically located too close to (a) another short-term rental (like Plaintiffs the Hansens) or (b) a hotel, (2) the County has issued enough licenses to hit the 1% density cap, (3) the owners have property in (a) the Town of Mt. Charleston (like Plaintiff McKannon) or (b) the other prohibited townships, (4) the owners own another property already being used as a short-term rental (like Plaintiffs the Koorndyks), or (5) the County has cited the owner for violating the Challenged Provisions and has thereby stripped the owner of the ability to seek a license.

141.    In this way, Defendants have stepped into Plaintiffs' shoes as property owners to dictate what leasehold interests they may create in their own land and has prevented them from offering the short-term interests they would otherwise have decided to create.

142.    By commandeering the right to lease and by defining the duration of acceptable leaseholds, Defendants have plainly appropriated the right to lease and effected a *per se* taking, which triggers the Takings Clause's protections. *See Cedar Point Nursery*, 594 U.S. at 149–50; *see also, e.g.*, *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1294 (Fed. Cir. 2008) (explaining that the government effected a per se physical taking of the owner's water rights by directing it to construct a fish ladder and by commandeering the water's flow and diverting it toward the fish ladder); *Va. Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 651 (E.D. Va. 2023) ("[T]he government cannot commandeer a professional's service and time for public use without providing just compensation.").

143.    In addition to appropriating Plaintiffs' right to lease, Defendants have appropriated Plaintiffs' right to include—a corollary of the right to exclude. *See, e.g.*, *Union Carbide Corp.*

*v. Alexander*, 679 S.W.2d 938, 940 (Tenn. 1984) (explaining that the fundamental "rights associated with the ownership of property" include the core rights and their corollaries—*i.e.*, "the right to refuse to do any of the[m]"). The right to exclude has received renewed attention in takings jurisprudence, as the Supreme Court's recent decision in *Cedar Point Nursery* underscored that the "[t]he right to exclude" is "one of the most treasured rights of property ownership." 594 U.S. at 149 (citing Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 742–43 (1998)). And the Court has reaffirmed that government regulations that "interfere" with a property owner's exclusion right constitutes a *per se* physical taking—entitling the property owner to just compensation. *Sheetz*, 601 U.S. at 274.

144.    *Cedar Point Nursery*'s reasoning extends just the same to the right to include, the direct corollary of the right to exclude. Both the right to include and the right to exclude are necessary for property owners to act as gatekeepers of their properties and are thus inseparable from one another. *See, e.g.*, Merrill, *Property and the Right to Exclude*, *supra*, at 742–43 ("[T]he right to exclude must encompass . . . the owner's right to include others."). After all, to say that property owners have a right to "exclude" others from their property is just another way of saying that they have a right to decide which individuals to "include" by granting access to the property. *See id.* at 740 n.37 (explaining that the right to exclude is "more precise[ly]" understood as a "gatekeeper power" involving "the right to determine who has access to particular resources and on what terms").

145.    Thus, just as government interference with the right to exclude effects a *per se* appropriation of a fundamental property right warranting an award of just compensation under the Takings Clause, government interference with the right to include equally constitutes a *per se* taking that also categorically entitles the property owner to just compensation. *See Dolan*, 512

48

U.S. at 394 (noting that a government-mandated easement across the owner's property would interfere with her right to include by causing her to "lose all [her] rights to regulate the time in which the public entered onto the greenway," while simultaneously causing "[h]er right to exclude . . . [to] be eviscerated").

146.    The Challenged Provisions infringe on Plaintiffs' inclusion rights by prohibiting them from hosting guests on their property—the paradigmatic example of exercising the right to include. As a result, Defendants have destroyed fundamental elements of the vast majority of property owners' rights to include others on their property through the use of the lease—all in contravention of well-established historical practice. Defendants owe just compensation for appropriating this essential stick in Plaintiffs' property rights bundle and thereby effecting a *per se* physical taking.

147.    In short, for at least two reasons, the Challenged Provisions unquestionably effect *per se* takings of Plaintiffs' properties in violation of the Takings Clause. Through those provisions, Defendants have violated the bedrock rule of takings jurisprudence that they may not "extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking." *Tyler*, 598 U.S. at 645. This includes Plaintiff Flores. Although she is not currently barred from exercising her fundamental rights, she is entitled to do so whether or not she holds a license, and free of the more onerous restrictions imposed on those precious few upon whom a license is conferred, and thus she too and other GLVSTRA members are entitled to injunctive relief to prevent Defendants from taking her property in the future by requiring her to continue to hold a license to exercise her fundamental rights incident to property ownership. Defendants therefore have a categorical duty to provide just compensation to Plaintiffs.

**COUNT II**
**Regulatory Taking**
**U.S. Const. amends. V, XIV; 42 U.S.C. § 1983**
**By All Plaintiffs against all Defendants**

148.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

149.    The Challenged Provisions also effect a regulatory taking. As noted above, to determine whether a regulatory taking has occurred, courts balance the factors set forth in *Penn Central*: (1) "The economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." 438 U.S. at 124.

150.    Plaintiffs the Koorndyks, McKannon, and Uehling, as well as GLVSTRA's members, have suffered a regulatory taking under this standard. First, they purchased the properties in question with certain investment-backed expectations, prior to the enactment of the Challenged Provisions. Considering the well-established historical pedigree for property owners' leasing their property on a short-term basis and that the right to lease is grounded in Nevada property law, these property owners reasonably would not expect Defendants to destroy this longstanding use of one's property by legislative fiat, as it has done here. After all, the Supreme Court has made clear that jurisdictions cannot "manipulate[]" or "extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking." *Tyler*, 598 U.S. at 645.

151.    Second, the Challenged Provisions substantially diminish Plaintiffs' property values and income-earning potential. As explained above, the Challenged Provisions grossly impede, and in some cases entirely destroy, the ability for County residents to put their homes to economic uses. This accords with the general experience of property owners, who offer short-term rentals precisely because it serves as the principal mechanism for unlocking the full value of their

properties. *See* AirDNA, 2023 Short-Term Rental Statistics You Need to Know (Jan. 28, 2024), https://tinyurl.com/erchybnp (noting that short-term rentals generated approximately $26,000 in revenue per listing in 2023); *see* Ron Bekkerman, et al., *Research: Restricting Airbnb Rentals Reduces Development*, Harv. Bus. Rev. (Nov. 17, 2021), https://tinyurl.com/he7uh6we (finding that, of the sample of properties surveyed, those that could offer short-term rentals "sold for an average 38% more than those" that could not, in part because owners were incentivized to invest in improvements).

152.    Third, the government's action is most naturally characterized as effecting a physical invasion of owners' property. As detailed above, Defendants' action fits comfortably within the *per se* takings framework precisely because the Challenged Provisions appropriate Plaintiffs' fundamental rights to lease and to include others on the property on a short-term basis, the corollary of the right to exclude. And the Challenged Provisions are of a particularly sordid character because they encroach upon a fundamental property right that has long been a part of our nation's history and tradition.

153.    Defendants have thus effected a regulatory taking through these Challenged provisions, for which Plaintiffs are entitled to an award of just compensation.

154.    However, if the Challenged Provisions somehow pass muster under the *Penn Central* test, the Supreme Court would have no choice but to revisit that test, which is not actually "ground[ed] . . . in the Constitution as it was originally understood." *Murr v. Wisconsin*, 582 U.S. 383, 419 (2017) (Thomas, J., dissenting); *see also Bridge Aina Le'a, LLC v. Haw. Land Use Comm'n*, 141 S. Ct. 731, 731 (2021) (Thomas, J., dissenting from denial of certiorari); *First Eng. Evangelical Lutheran Church v. Cnty. of Los Angeles*, 482 U.S. 304, 340 n.17 (1987) (Stevens, J., dissenting).

**COUNT III**
**Per Se Taking of Property Without Just Compensation**
**Article 1, Section 8(3) of the Nevada Constitution**
**By all Plaintiffs against the County Defendants**

155.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

156.    Nevada's analogue to the federal Takings Clause mirrors its federal counterpart and reflects the state's "rich history of protecting private property owners against government takings." *Sisolak*, 137 P.3d at 1127.

157.    As further explained in Count I, a "[p]er se" takings occur whenever government interference with property effects "a direct government appropriation or physical invasion of private property." *Chevron U.S.A., Inc.*, 544 U.S. at 537; *see also City of Las Vegas v. 180 Land Co., LLC*, 546 P.3d 1239, 1249 (Nev. 2024). For *per se* takings, "the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery*, 594 U.S. at 147.

158.    The Challenged Provisions effect "per se" takings because they prevent large categories of Clark County residents, including but not limited to Plaintiffs Flores, the Koorndyks (at their second property), McKannon, the Hansens, and Uehling (as well as many of Short-Term Rental Association's members), from exercising their fundamental property rights to lease and to include others on their properties, a corollary of the right to exclude. As fundamental "stick[s] in the bundle of property rights," the right to lease and the right include others are cognizable property interests that support a takings claim under the Nevada Constitution. *180 Land Co.*, 564 P.3d at 1249; *see Cnty. of Clark v. Sun State Properties, Ltd.*, 72 P.3d 954, 958 (Nev. 2003) (analyzing the proper method for calculating the value of a leasehold interest that was part of the property the County had condemned). Indeed, as the U.S. Supreme Court recently reaffirmed in *Cedar Point*

*Nursery*, "[t]he right to exclude" implicates an owner's physical control of their property and is therefore "one of the most treasured rights of property ownership." *Id.* That reasoning extends just the same protections to the right to include, the exclusion right's direct corollary.

159.     Through the destruction of Plaintiffs' rights to lease and to include others, the County has eviscerated their ability as property owners to serve as the gatekeepers of their properties. And by coopting Plaintiffs' ability to control a key physical aspect of their properties, the County has effected *per se* takings, for which Plaintiffs are owed just compensation. This includes Plaintiff Flores. Although she is not currently barred from exercising her fundamental rights, she is entitled to do so whether or not she holds a license and thus is entitled to injunctive relief to prevent the County from taking her property in the future by requiring her to continue to hold a license to exercise her fundamental rights incident to property ownership. In this way, the County Defendants have violated Article I, Section 8(3) of the Nevada Constitution.

**COUNT IV**
**Regulatory Taking**
**Article 1, Section 8(3) of the Nevada Constitution**
**By All Plaintiffs against the County Defendants**

160.     Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

161.     The Challenged Provisions also constitute an unlawful regulatory taking under Nevada law. As further explained in Count II, to evaluate whether a government has effected a regulatory taking, Nevada courts consider several factors "such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Cedar Point Nursery*, 594 U.S. at 148 (citing *Penn Cent.*, 438 U.S. at 124); *see also Sisolak*, 137 P.3d at 1122–23.

162.    Plaintiffs Flores, the Koorndyks, McKannon, and Uehling, as well as GLVSTRA's members, have suffered a regulatory taking under this standard. First, they purchased the properties in question, with certain investment-backed expectations, prior to the enactment of the Challenged Provisions. Second, the Challenged Provisions impose a severe economic impact on Plaintiffs' property. As explained above, the Challenged Provisions grossly impede, and in some cases entirely destroys, the ability for County residents to put their homes to economic use. Third, these harms are most naturally characterized as effecting a physical invasion of owners' property, which is particularly pernicious given they encroach upon fundamental ownership rights that played a fundamental role in our nation's history.

163.    Despite these takings, the County Defendants have offered no just compensation to Plaintiffs. In this way, the County Defendants have violated Article I, Section 8(3) of the Nevada Constitution.

## Count V
### Per Se Taking of Property Without Just Compensation
### U.S. Const. amends. V, XIV; 42 U.S.C. § 1983
**By All Plaintiffs against All Defendants**

164.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

165.    The Challenged Provisions also effect per se takings because they force licensees, property owners who lease their properties on a short-term basis, to suffer physical incursions on their properties, including but not limited to the following provisions.

166.    In particular, the Challenged Provisions compel short-term rental license holders and applicants, including many of GLVSTRA's members, to "install a functional street-facing security camera" as well as "noise monitoring devices" in several locations on their properties. Clark County Code § 7.100.170(o), (r).

54

167.    The Supreme Court has already determined that physical occupations such as these constitute *per se* takings that warrant just compensation.

168.    In *Loretto*, a property owner challenged a state law that authorized a cable television company to install a half-inch diameter cable and two one-and-a-half cubic-foot boxes on her roof. 458 U.S. at 424. As the Court explained, because the state-authorized "installation involved a direct physical attachment of plates, boxes, wires, bolts, and screws to the building," it "appropriate[d] [the owner's] property"—a quintessential physical *per se* takings. *Id.* at 439. As the Court observed, when government action results in a "physical occupation of property, [its] cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 434–45. It did not matter that the occupation was quite small and spatially limited: "constitutional protection for the rights of private property cannot be made to depend on the size of the area permanently occupied," *id.* at 436—the size of the incursion "bears only on the amount of compensation," *Cedar Point Nursery*, 594 U.S. at 153.

169.    A straightforward application of *Loretto* here compels the conclusion that the security-camera and noise-device installation requirements constitute *per se* takings. Defendants have forced property owners, like Plaintiffs, to suffer (at their own expense and personal effort) the physical intrusion of security cameras and noise devices. Indeed, these devices are physically installed on the property under government threat to deny them their fundamental rights to lease and to include others on their properties on a short-term basis. *See Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (holding that compelling a property owner to dedicate an easement for public use would constitute a taking).

170.    And it is no answer for Defendants to say that such installations are supported by the exercise of their police powers. As the Court made clear, "physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Loretto*, 458 U.S. at 426. And the Clark County Code identifies already extant nuisance regulations that short-term rentals must follow. *See* Clark County § 7.100.180(c)-(f). The County has provided no explanation for why it must foist additional restrictions that cause unwanted physical invasions of owners' property, who simply want to exercise their fundamental property rights by virtue of their ownership, when the County can simply enforce its existing nuisance rules as warranted. Rather, it reflects a singular effort to shoulder property owners who wish to lease their properties on a short-term basis to shoulder "public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49.

171.    As a result, the compelled installation of security cameras and noise-devices are plain physical occupations, for which Plaintiffs are entitled to an award of just compensation under the Takings Clause.

**COUNT VI**
**<u>Violation of the Fundamental Right to Lease</u>**
**U.S. Const. amend. XIV; 42 U.S.C. § 1983**
**By All Plaintiffs against All Defendants**

172.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

173.    The Fourteenth Amendment guarantees that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law." U.S. const. amend. XIV.

174.    The Fourteenth Amendment protects "more than fair process: It also 'provides heightened protection' against government interference with certain fundamental rights and liberty interests." *Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024). Courts identify those rights and liberties first by carefully describing "the asserted fundamental liberty interest" before assessing whether that right is "objectively deeply rooted in this Nation's history and tradition." *See Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997).

175.    Once a fundamental right is recognized, governments may only burden that right "by narrowly tailored means that serve a compelling state interest." *Muñoz*, 602 U.S. at 910. Although not quite "fatal in fact," most, if not all, regulations subject to this level of review will be struck down as constitutionally invalid. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995).

176.    The right of property owners to lease their own property, for any time period, to guests as a temporary place of abode is one such fundamental right protected by substantive due process. As the survey Plaintiffs provide above reveals, this right is deeply rooted in the Nation's legal, political, and social history and traditions. The Supreme Court recognized as much in decisions stretching back over 140 years, when it described the right to "lease" as one of the "fundamental rights which are the essence of civil freedom." *Civil Rights Cases*, 109 U.S. at 22.

177.    The very founding of this country was predicated upon the strongly held belief that property rights were critical to securing precious personal freedoms from an arbitrary or tyrannical government. Accordingly, the Framers of the Constitution strove to enshrine within the constellation of rights held by the people traditional property rights—including the rights to include, exclude, and lease—as well as notions of privacy, autonomy, and association necessary to a robust civil society that would remain free from the stifling hand of official intervention of the

type suffered by our revolutionary forebearers. This right is protected by the Fifth and Fourteenth Amendments and is supported by the right to free association protected by the First Amendment, and the right to privacy protected by the Fourth Amendment.

178.    Historical practice bears out this traditional understanding. The nation's very birth owes a debt to the early American hosts who provided temporary shelter to the drafters of the Constitution as they hashed out their differences; to an early Supreme Court struggling to find its way; and to politicians working the country's first Congresses who by exposure in early short-term rentals were able to bridge an ideological divide that seems increasingly impossible today. That exercise of the fundamental right to lease continues straight through until today.

179.    The Challenged Provisions, both individually and collectively, burden this fundamental right by making its exercise difficult, in many cases impossible, and ultimately a matter of chance. For some Plaintiffs, this means financial losses and impediments to their exercise of other liberties like privacy and the freedom of association. For others, it will mean, in addition, a complete prohibition on their ability to exercise their right to lease, sometimes for no reason other than the fact that they happen to own property located within an arbitrary distance to an incumbent hotel.

180.    As a result of these burdens, the Challenged Provisions are subject to strict scrutiny and may only survive if Defendants muster compelling interests to support a narrowly tailored law. But this they cannot do. The Challenged Provisions reflect Defendants' naked effort to protect Nevada's hotel industry at the expense of the constitutional rights of its residents. And even if Defendants could identify a legitimate interest in the laws, it certainly cannot identify compelling ones and will be unable to reasonable claim that the Challenged Provisions, which impose sweeping obligations and restrictions on its residents, are narrowly tailored to achieve those aims.

181.    The Challenged Provisions accordingly violate the Fourteenth Amendment of the United States Constitution.

## COUNT VII
### Violation of the Fundamental Right to Lease
### Article 1, Section 8(5) of the Nevada Constitution
### By All Plaintiffs against the County Defendants

182.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

183.    Like the United States Constitution, the Nevada Constitution "prohibits the State from depriving 'any person of life, liberty, or property, without due process of law.'" *Doe v. State ex rel. Legislature of 77th Sess.*, 406 P.3d 482, 484 (Nev. 2017) (quoting Nev. Const. art. 1, § 8(5)). The Nevada Supreme Court has interpreted the substantive due process afforded by this provision to be coextensive with federal substantive due process. Accordingly, it identifies fundamental rights enshrined in this provision through the same two-step test identified by the U.S. Supreme Court. *See id.* at 484–85.

184.    The right of property owners to lease their own property, for any time period, to guests as a temporary place of abode is one such fundamental right protected by this provision. As the survey Plaintiffs provide above reveals, this right is deeply rooted in the Nation's legal, political, and social history and traditions.

185.    The very founding of this Country was predicated upon the strongly held belief that property rights were critical to securing precious personal freedoms from an arbitrary or tyrannical government. Accordingly, the Framers of the Constitution strove to enshrine within the constellation of rights held by the people traditional property rights—including the rights to include, exclude, and lease—as well notions of privacy, autonomy, and association necessary to a

robust civil society that would remain free from the stifling hand of official intervention of the type suffered by our revolutionary forebearers.

186.     This legal tradition adds up to a fundamental right to lease—defined as the right of property owners to lease their own property, for any time period, to guests as a temporary place of abode.

187.     Historical practice bears out this traditional understanding. The nation's very birth owes a debt to the early American hosts who provided temporary shelter to the drafters of the Constitution as they hashed out their differences; to an early Supreme Court struggling to find its way; and to politicians working in the country's first congresses who by exposure in early short term rentals were able to bridge an ideological divide that seems increasingly impossible today. That exercise of the fundamental right to lease continues straight through until today.

188.     The Challenged Provisions, both individually and collectively, burden this fundamental right by making its exercise difficult, in many cases impossible, and ultimately a matter of chance. For some Plaintiffs, this means financial losses and impediments to their exercise of other liberties like privacy and the freedom of association. For others, it will mean, in addition, a complete prohibition on their ability to exercise their right to lease.

189.     As a result of these burdens, the Challenged Provisions are subject to strict scrutiny and may only survive if the County Defendants muster compelling interests to support a narrowly tailored law. But this they cannot do. The Challenged Provisions reflect an express effort by the County to protect Nevada's hotel industry and at the expense of the constitutional rights of its residents. And even if the County could identify a legitimate interest in the laws, it certainly cannot identify compelling ones and will be unable to reasonably claim that the Challenged Provisions,

which impose sweeping obligations and restrictions on its residents, are narrowly tailored to achieve those aims.

190.    The Challenged Provisions accordingly violate Article 1, Section 8(5) of the Nevada Constitution.

## COUNT VIII
## Arbitrary and Irrational Restriction on Liberty Interests
### U.S. Const. amend. XIV; 42 U.S.C. § 1983
### By All Plaintiffs against All Defendants

191.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

192.    Beyond guaranteeing fundamental rights, the Fourteenth Amendment bars governments from arbitrarily and irrationally burdening liberty interests. *See Merrifield v. Lockyer*, 547 F.3d 978, 986 (9th Cir. 2008).

193.    The Challenged Provisions run afoul this constitutional requirement.

194.    As explained above, the Challenged Provisions impose severe burdens on Plaintiffs' liberty interests. These burdens at least include financial losses, stemming from Plaintiffs' inability or burdened ability to operate a short-term rental and from impediments to their exercise of other liberties like privacy and the freedom of association.

195.    Defendants have no legitimate basis for imposing these burdens. Indeed, as the legislative history and enactments demonstrate, the Challenged Provisions are motivated by an interest in economic protectionism—the Challenged Provisions exist to protect the state's hotel industry from competition. That much is obvious from the arbitrary exemptions they provide to hotels and casinos who wish to operate short-term rentals. But economic protectionism is a per se illegitimate and irrational basis for imposing burdens on protectable economic interests. *See Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1064 (9th Cir. 2018) (holding that "bare economic

protectionism is not a valid justification for discriminatory treatment" under the Equal Protection Clause).

196.     Defendants' favoritism toward the hotel industry is also irrational. Chapter 7.100 explains that the County adopted its protectionist framework because "[t]he increasing number of short-term rental units in Clark County has diverted a noticeable portion of transient lodging away from traditional transient lodging establishments and has negatively impacted the revenue derived from such rentals to local governments and other agencies and beneficiaries of transient lodging taxes." *Id.* § 7.100.010(c). But short-term rentals are taxed the same transient lodging tax as hotels. As a result, Defendants' severe restrictions on short-term letting by non-hotel owners—in other words, its decision to favor hotels over hosts—is arbitrary and irrational.

197.     Even if Defendants were able to identify an interest aside from protecting the State's hotel industry--which they have tried, but failed to do--they still will not be able to offer a rational basis to support the severe burdens imposed by the Challenged Provisions. Indeed, not even an appeal to health and safety can save Defendants, who cannot arbitrarily impose restrictions that encroach upon constitutional liberties of short-term rental operators that are not borne by other similarly situated property owners.

198.     Moreover, many of the Challenged Provisions are inherently arbitrary, irrational and capricious or otherwise violations of substantive or procedural due process, including provisions already identified—the 1,000-foot and 2,500-foot buffer—but also: (a) restricting the total units allowed for short term rentals to 1% of housing units in the area (County Code § 7.100.050), (b) a random lottery system to determine the order in which applications received are processed, as opposed to first, come first served (*id.* § 7.100.100(g)); (c) discretionary review of applications for completeness without notice if an application is deemed incomplete (*id.* §

7.100.100(f)); (d) apparently random inspections without cause by *any* county agency or department for compliance with a raft of potential interlocking regulations (§§7.100. 170(j)); (e) occupancy and other booking restrictions that bear no relation to the size or configuration of an individual property or the demographic of the prospective guest(s) (*id.* § 7.100.160(a)); (f) prohibitions on otherwise permitted or even constitutionally protected gatherings (*id.* § 7.100.180(b)); and (g) the declaration that the operation of "[a]ny residential unit or room within a residential unit which is operated as a short-term rental unit and which does not comply with the provisions of this chapter constitutes a public nuisance" (*id.* § 7.100.220(b)).

199.    Accordingly, the Challenged Provisions violate the Fourteenth Amendment of the United States Constitution.

## COUNT IX
### Arbitrary and Irrational Restriction on Liberty Interests
**Article 1, Section 8(2) of the Nevada Constitution**
**By All Plaintiffs against the County Defendants**

200.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

201.    Like its federal counterpart, the Nevada Constitution instructs courts to strike down laws that are not "rationally related to a legitimate government interest." *Peck v. Zipf*, 407 P.3d 775, 895 (Nev. 2017).

202.    The Challenged Provisions run afoul this constitutional requirement.

203.    As explained above, the Challenged Provisions impose severe burdens on Plaintiffs' liberty interests. These burdens at least include financial losses, stemming from Plaintiffs' inability or burdened ability to operate a short-term rental and from impediments to their exercise of other liberties like privacy and the freedom of association.

204.    The County Defendants have no rational basis for imposing these burdens. Indeed, as the legislative history and enactments demonstrate, the Challenged Provisions are motivated by an interest in economic protectionism—the Challenged Provisions exist to protect the state's hotel industry from competition. But economic protectionism is a per se illegitimate and irrational basis for imposing burdens on protectable economic interests. Even if Defendants were able to identify an interest aside from protecting the State's hotel industry--which they have tried, but failed to do--they still will not be able to offer a rational basis to support the severe burdens imposed by the Challenged Provisions. Indeed, not even an appeal to health and safety can save the County. The County cannot arbitrarily impose restrictions that encroach upon constitutional liberties of short-term rental operators that are not borne by other similarly situated property owners.

205.    Accordingly, the Challenged Provisions violate Article 1, Section 8(5) of the Nevada Constitution.

**COUNT X**
**Unlawful Warrantless Searches**
**U.S. Const. amends. IV, XIV; 42 U.S.C. § 1983**
**By All Plaintiffs against All Defendants**

206.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

207.    The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015).

208.    The United States Supreme Court has repeatedly held that "searches conducted outside the judicial process, without proper approval by a judge or a magistrate judge, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions."

*Id.* (cleaned up). "This rule applies to commercial premises as well as to homes." *Id.* at 419–20 (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978)).

209.    Nevertheless, one of the exceptions to the bar on warrantless searches are so-called "administrative searches," *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 534 (1967), searches "distinguishable from the general interest in crime control" used to ensure regulatory compliance, *Patel*, 576 U.S. at 420. But still, "in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review" of the search "before a neutral decisionmaker." *Id.*

210.    The Surveillance Provisions, Clark County Code §§ 7.100.100(h), 7.100.130(c), 7.100.170(i)(2), 7.100.200(b), violate the Fourth and Fourteenth Amendments by authorizing warrantless administrative searches without offering Plaintiffs an opportunity for precompliance review.

211.    Specifically, the Surveillance Provisions authorize County officials to conduct "[r]andom [i]nspections . . . at any time," with no opportunity for the host to challenge the legitimacy of the inspection before its execution as long as forty-eight hours' notice is provided. *Id.* § 7.100.200(b). That search can reach not only Plaintiffs' books and records, *id.* § 7.100.200(c)(1), but also the most sensitive parts of their homes, including "bedrooms, bathrooms, [the] kitchen, dining area, living room, garage and yard," *id.* § 7.100.100(h).

212.    In other words, the Surveillance Provisions authorize warrantless searches of places where reasonable expectations of privacy are at their zenith. And while Defendants may claim those warrantless searches fall within the Supreme Court's "administrative search" exception to the warrant requirement, that argument will fail. Neither provision offers individuals subject to these searches an opportunity for precompliance review of the search.

213.    Plaintiffs Flores and the Koorndyks, as well as GLVSTRA's members, have been and will continue to be injured by the Surveillance Provisions because they have been forced to submit to warrantless searches of their property without an opportunity for pre-compliance review. The Surveillance Provisions continue to injure Flores and the Koorndyks, as well as GLVSTRA's members, because they create an imminent threat of random additional warrantless searches and will force Plaintiffs to submit to warrantless searches each year during the renewal process, without ever providing an opportunity for pre-compliance review.

214.    Further, the Surveillance Provisions, and in particular those provisions compelling owners to collect information via compulsory security cameras and noise-devices, raise additional Fourth Amendment concerns. There is no precedent for forcing private property owners to install data collection devices on their properties and then gather information that they would not otherwise choose to obtain and then supply that information, whenever requested, to the government to facilitate its law-enforcement efforts.

215.    By enlisting private property owners and compelling them to assist with law-enforcement efforts, the Surveillance Provisions further violate Plaintiffs' Fourth Amendment rights.

216.    Accordingly, these provisions are unconstitutional under the Fourth and Fourteenth Amendments.

**COUNT XI**
**Unlawful Warrantless Searches**
**Article 1, Section 18 of the Nevada Constitution**
**By All Plaintiffs against the County Defendants**

217.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

218.    Like its federal counterpart, the Nevada Constitution provides "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause." Nev. Const. Art. I § 18. The Nevada Supreme Court has interpreted Section 18 to largely mirror the Fourth Amendment. Accordingly, under Nevada law "warrantless searches are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *State v. Lloyd*, 312 P.3d 467, 469 (Nev. 2013). That includes administrative searches to the extent that they do not provide for pre-compliance review. *See Patel*, 576 U.S. at 420.

219.    As explained above with respect to the Fourth Amendment, the Surveillance Provisions, Clark County Code §§ 7.100.100(h), 7.100.130(c), 7.100.170(i)(2), 7.100.200(b), violate Article I, Section 18 of the Nevada Constitution by authorizing warrantless searches without offering Plaintiffs an opportunity for precompliance review. Specifically, the Surveillance Provisions authorize County officials to conduct "[r]andom [i]nspections . . . at any time," with no opportunity for the host to challenge the legitimacy of the inspection before its execution as long as forty-eight hours' notice is provided. Clark County Code § 7.100.200(b). That search can reach not only Plaintiffs' books and records, *id.* § 7.100.200(c)(1), but also the most sensitive parts of their homes, including "bedrooms, bathrooms, [the] kitchen, dining area, living room, garage and yard," *id.* § 7.100.100(h).

220.    In other words, the Surveillance Provisions authorize warrantless searches of places where reasonable expectations of privacy are at their zenith. And while the County Defendants may claim those warrantless searches fall within the Supreme Court's "administrative search" exception to the warrant requirement, that argument will fail. Neither provision offers individuals subject to these searches an opportunity for precompliance review of the search.

221.    Plaintiffs Flores and the Koorndyks, as well as GLVSTRA's members, have been and will continue to be injured by the Surveillance Provisions because they have been forced to submit to warrantless searches of their property without an opportunity for pre-compliance review. The Surveillance Provisions continue to injure Plaintiffs Flores and the Koorndyks, as well as GLVSTRA's members, because they create an imminent threat of random additional warrantless searches and will force Plaintiffs to submit to warrantless searches each year during the renewal process, without ever providing an opportunity for pre-compliance review.

222.    Further, the Surveillance Provisions, and in particular those provisions compelling owners to collect information via compulsory security cameras and noise-devices, raise additional Fourth Amendment concerns. By enlisting private property owners and compelling them to assist with law-enforcement efforts, the Surveillance Provisions further violate Plaintiffs' Fourth Amendment rights.

223.    Accordingly, these provisions are unconstitutional under Article I, Section 18 of the Nevada Constitution.

### COUNT XII
### Equal Protection Violation
### U.S. Const. amend. XIV; 42 U.S.C. § 1983
### By All Plaintiffs against All Defendants

224.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

225.    The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

226.    The Supreme Court has held that this clause protects individuals who "ha[ve] been intentionally treated differently from others similarly situated" by the government with respect to their fundamental rights, *see Plyler v. Doe*, 457 U.S. 202, 216–17 (1982), or when "there is no

rational basis for the difference in treatment," *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 904 (1986) ("Whenever a state law infringes a constitutionally protected right, we undertake intensified equal protection scrutiny of that law."); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (explaining that, in the equal-protection context, regulations that "affect fundamental rights" trigger more than rational-basis review). "[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires . . . that the classification rationally further a legitimate state interest." *Id.*

227.    The Challenged Provisions violate the federal Equal Protection Clause. The Challenged Provisions provide short-term rental owners a 1,000-foot protective buffer from other short-term rentals, unjustifiably barring some property owners from exercising their fundamental property rights while others are doing so. Clark County Code § 7.100.080(f); *see also* Nev. Rev. Stat. Ann. § 244.353545(f). Moreover, the Challenged Provisions severely burden, and in some cases outright bar, Plaintiffs' exercise of their fundament property rights to lease and to include others on their properties on a short-term basis, while providing exemption to hotels operating short-term rentals in residential properties in precisely the same way. Clark County Code § 7.100.040(a)-(c).

228.    In this way, short-term rentals operated by Clark County residents are arbitrarily and irrationally classified for reduced protections as compared to short-term rentals in residential properties that just happen to be operated by hotels, even though such property owners are similarly-situated for the purposes of the Challenged Provisions. That difference in treatment is as intentional as it gets, and it implicates the fundamental rights to lease and to include others on

one's property. *See, e.g.*, *Plyler*, 457 U.S. at 217 n.15 (explaining that, when seeking to establish whether a right is fundamental, courts "look to the Constitution to see if the right infringed has its source, explicitly or implicitly, therein"); *Civil Rights Cases*, 109 U.S. at 22 (holding that the "right to . . . lease" is one of "those fundamental rights which are the essence of civil freedom"). *Cedar Point*, 594 U.S. at 149-50 (holding that the right to exclude, the corollary of the right to include, is a fundamental element of property ownership that merits protection under the Takings Clause).

229.    The Challenged Provisions are particularly objectionable because they represent a self-evident attempt at economic protectionism. Namely, Defendants treat these similarly situated individuals, who all intend to lease their properties on a short-term basis to others, disparately as a means of protecting the County and State's hotel industry. *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1064 (9th Cir. 2018) (holding that "bare economic protectionism is not a valid justification for discriminatory treatment" under the Equal Protection Clause).

230.    Moreover, it is no answer for Defendants to claim that the government may treat categories of property differently in some circumstances. As the Supreme Court has admonished, the government "may divide different kinds of property into classes" and regulate them differently only "so long as those divisions and burdens are reasonable." *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty.*, 488 U.S. 336, 346 (1989). And to qualify as reasonable within the meaning of *Allegheny Pittsburgh*, a jurisdiction cannot explain a regulation only with a rationale that contradicts fundamental constitutional values.

231.    As a result of the Challenged Provisions' arbitrary provisions and exemptions, Plaintiffs and GLVSTRA's members have suffered severe restrictions on their fundamental property interests and have thereby been prevented from unlocking the economic value of their property.

232.    Because there is no rational basis for these restrictions and exemptions, the Challenged Provisions violate the Equal Protection Clause of the Fourteenth Amendment.

**COUNT XIII**
**Equal Protection Violation**
**Article 4, Section 21 of the Nevada Constitution**
**By All Plaintiffs against All Defendants**

233.    Plaintiffs reallege and incorporate all allegations in this Complaint, as if set forth fully herein.

234.    Article 4, Section 21 of the Nevada Constitution guarantees equal protection of the laws. "At the heart of the Equal Protection Clauses is the idea that all people similarly situated are entitled to equal protection of the law." *Vickers v. Dzurenda*, 433 P.3d 306, 308 (Nev. App. 2018). "Thus, the threshold question is whether a statute treats similarly situated people disparately." *Id*. "[T]he standard of the Equal Protection Clause of the Nevada Constitution [is] the same as the federal standard." *Id*.

235.    The Challenged Provisions violate Nevada's Equal Protection Clause. In particular, the Challenged Provisions provide short-term rental owners a 1,000-foot protective buffer from other short-term rentals, unjustifiably barring some property owners from exercising their fundamental property rights while others are doing so. Clark County Code § 7.100.080(f). AB 363 requires a protective buffer of 660-feet.  NRS 244.353545(2)(f)(1).  Moreover, the Challenged Provisions severely burden, and in some cases outright bar, Plaintiffs' exercise of their fundament property rights to lease and to include others on their properties on a short-term basis, while providing exemption to hotels operating short-term rentals in residential properties in precisely the same way. *Id.* § 7.100.040(a)-(c).

236.    The Challenged Provisions' disparate treatment of these similarly situated individuals is not supported by a rational motivation. It does not help preserve neighborhood

character or keep guests and residents safe. Rather it is designed to protect the County and State's hotel industry and encroaches upon Plaintiffs' fundamental property rights.

237.    Because there is no rational basis for these restrictions and exemptions, the requirement violates the Article 4, Section 21 of the Nevada Constitution.

**COUNT XIV**
**<u>As-Applied Challenge to Fine Provisions</u>**
**U.S. Const. amends. VIII, XIV; 42 U.S.C. § 1983**
**By Plaintiff Philip Johnson and GLVSTRA Members Similarly Situated**
**against all Defendants**

238.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

239.    The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment is incorporated against the states and local governments under the Due Process Clause of the Fourteenth Amendment. *Timbs v. Indiana*, 586 U.S. 146, 150 (2019).

240.    A fine is covered by the Excessive Fines Clause if it effects a "punishment." *Austin v. United States*, 509 U.S. 602, 609–10 (1993). And a fine is excessive "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 341, 334 (1998).

241.    The Fine Provisions violate the federal constitution as applied to Plaintiff Philip Johnson. Defendants have punished Johnson for exercising his fundamental property rights by imposing upon him fines in excess of $45,000 for engaging in the short-term rental of his property. That fine is grossly disproportionate by any measure.  But it adds insult to constitutional injury that the only basis for Defendants' imposition of the fine is Johnson's constitutionally protected activity.

242.    Because Johnson's fines exceeding $45,000 constitute punishment and is grossly disproportionate to the gravity of Johnson's alleged offense (all for exercising his constitutionally protected, fundamental property rights), the Fine Provisions plainly violate the Eighth Amendment.

**COUNT XV**
**<u>As-Applied Challenge to Fine Provisions</u>**
**Article 1, Section 6 of the Nevada Constitution**
**By Plaintiff Philip Johnson and GLVSTRA Members Similarly Situated**
**against the County Defendants**

243.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

244.    Article I, Section 6 of the Nevada Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishments be inflicted, nor shall witnesses be unreasonably detained." In assessing whether a fine is excessive, Nevada courts apply the same legal standard as the federal courts do with respect to the Eighth Amendment. *See Air Flandes, LLC v. Clark Cnty. Pub. Resp. Off.*, No. 86140-COA, 2024 WL 750138, at *4 (Nev. App. Feb. 22, 2024).

245.    The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." A fine is covered by the federal Excessive Fines Clause if it effects a "punishment." *Austin*, 509 U.S. at 609–10. And a fine is excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. Accordingly, if the fine effects a punishment and is disproportionate to the gravity of the offense, the fine also violates Article I, Section 6 of the Nevada Constitution. The Fine Provisions violate the Nevada constitution as applied to Plaintiff Philip Johnson. Defendants have punished Johnson for exercising his fundamental property rights by imposing upon him fines

exceeding $45,000. Those fines are grossly disproportionate by any measure, but it is especially repugnant given that the only basis for Defendants' imposition of the fine is Johnson's constitutionally protected activity.

246.    Because Johnson's fines of more than $45,000 constitutes punishment and is grossly disproportionate to the gravity of Johnson's alleged offense (all for exercising his constitutionally protected, fundamental property rights), the Fine Provisions plainly violate Article I, Section 6 of the Nevada Constitution.

**COUNT XVI**
**<u>Unlawful Warrantless Searches</u>**
**U.S. Const. amends. IV, XIV; 42 U.S.C. § 1983**
**By All Plaintiffs against All Defendants**

247.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

248.    The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." *Patel*, 576 U.S. at 419.

249.    The Monthly Report Requirement violates the Fourth Amendment by demanding that platforms like Airbnb issue monthly reports to the County, divulging troves of highly sensitive and confidential information about *every single short-term rental listing in Clark County* and the listing and booking activity in the County. Clark County Code § 7.110.080(e)-(f). This information includes, for example, personal identifying information of hosts, detailed financial information, and "any other information as the [Department of Business License] may deem necessary" at its unfettered discretion. *Id.*

250.    Airbnb's users—including Plaintiffs—have privacy interests in the non-public confidential records maintained by Airbnb concerning their short-term rental property and personal

74

information. Airbnb, too, has a reasonable expectation of privacy in the highly confidential and sensitive information demanded by the Monthly Report Requirement—a privacy interest already recognized by several courts that have struck down similar data disclosure provisions. *See Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 484 (S.D.N.Y. 2019) (Airbnb has "privacy interests in [its] user-related records that are more than sufficient to trigger Fourth Amendment protection"); *Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 125 (D. Mass. 2019) [*Airbnb Boston*]. As these courts recognized, the conclusion that Airbnb's records are protected by the Fourth Amendment is dictated by the Supreme Court's decision in *City of Los Angeles v. Patel*, which held that a hotel had a Fourth Amendment privacy interest in its confidential guest records. 576 U.S. at 414.

251.    Because the Monthly Report Requirement implicates the Fourth Amendment, this provision must be reasonable, meaning it must (i) allow an opportunity for pre-compliance review before a neutral decisionmaker *before* compliance comes due; and (ii) be appropriately tailored. *See Patel*, 576 U.S. at 410; *See v. City of Seattle*, 387 U.S. 541, 544 (1967). The Monthly Report Requirement fails on both counts: as with the other provisions of the Code that violate the Fourth Amendment, there is no mechanism for platforms to challenge the requirement without first violating the Code and risking severe sanctions. And the requirement is in no way tailored—indeed, it includes catch-all provisions that allow the County to request *any information* from platforms, with no guardrails or limitations, embodying the very definition of a completely untailored demand for information.

252.    The Verification Requirements similarly raise Fourth Amendment problems.  As detailed above, the Verification Requirements shift the County's law enforcement role onto Airbnb, by compelling it to affirmatively verify the legal eligibility of each short-term rental booking and

to enforce the law for the County by removing listings Airbnb itself has found to be in non-compliance.

253.    In essence, these provisions allow the County to shirk its own responsibility to enforce its laws, instead deputizing Airbnb and platforms like it to conduct those policing obligations for the County unconstrained by the Fourth Amendment.  There is no precedent for allowing the government to avoid the Fourth Amendment by forcing a private party to act as its law enforcement, while it sits on the sidelines.  Indeed, the Supreme Court has clearly established that the Fourth Amendment applies to private actors acting under government compulsion, just the same as it limits governmental searches and seizures.  *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 614 (1989); *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

254.    So by foisting the County's law enforcement responsibilities on Airbnb and other platforms, the Verification Requirements have further violated Airbnb's Fourth Amendment rights.

255.    Accordingly, both the Monthly Report Requirement and the Verification Requirements are unconstitutional under the Fourth and Fourteenth Amendments.

**COUNT XVII**
**Unlawful Warrantless Searches**
**Article 1, Section 18 of the Nevada Constitution**
**By All Plaintiffs against the County Defendants**

256.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

257.    Like its federal counterpart, the Nevada Constitution provides "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause." Nev. Const. Art. I § 18. The Nevada Supreme Court has interpreted Section 18 to largely mirror the Fourth Amendment.

258.     The Monthly Report Requirement violates Section 18 of the Nevada Constitution by requiring Airbnb to disclose confidential and sensitive information to the County, which Plaintiffs consider to be private. It does so without providing Plaintiffs with an opportunity for precompliance review prior to a violation, and without appropriately tailoring the demand.

259.     Accordingly, these provisions are unconstitutional under Article I, Section 18 of the Nevada Constitution.

**COUNT XVIII**
**<u>Violation of and Preemption by the Stored Communications Act</u>**
**<u>18 U.S.C. §§ 2701 *et seq.*; 42 U.S.C. § 1983</u>**
**By Airbnb against All Defendants**

260.     Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

261.     Under the Stored Communications Act ("SCA"), "a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity," without appropriate legal process. 18 U.S.C. § 2702(a)(3).

262.     Under the SCA, a subpoena, court order, or search warrant is required to obtain non-content information about a user absent the user's consent. 18 U.S.C. § 2702(c) (describing the circumstances under which a governmental entity may compel the disclosure of "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications . . . )").

263.     Airbnb is a provider of an electronic communication service within the meaning of the SCA, because it provides its users with "the ability to send or receive wire or electronic communications," by, among other things, allowing hosts and guests to privately and securely message each other through the service. *Id.* § 2510(15). Airbnb also is a provider of a remote

computing service within the meaning of the SCA, because it provides its users "computer storage or processing services by means of an electronic communications system," by, among other things, allowing users to create listings and store photographs, documents, and correspondence. *Id.* § 2711(2).

264.    Defendants are "governmental entities" under the SCA.  *Id.* § 2711(4).

265.    The Monthly Report Requirement violates and conflicts with the SCA because it requires Airbnb to "divulge a record or other information pertaining to a subscriber to or customer of such service" to a "governmental entity" without appropriate legal process. Namely, it requires Airbnb to disclose on a monthly basis—with no legal process—information such as the names of hosts, addresses of hosts, and income of hosts, along with any other information about hosts and their listings that the County demands. Under the SCA, this type of data can only be disclosed in compliance with a subpoena, court order, or search warrant.

266.    For the foregoing reasons, the Monthly Report Requirement violates and is preempted by the SCA.

**COUNT XIX**
**<u>Impermissible Compelled Speech</u>**
**<u>U.S. Const. amend. I; 42 U.S.C. § 1983</u>**
**By Airbnb against All Defendants**

267.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

268.    The First Amendment "guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988). Supreme Court precedent interpreting the First Amendment "distinguish[es] between content-based and content-neutral regulations of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). "Content-based

regulations 'target speech based on its communicative content,'" and, "[a]s a general matter, such laws 'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

269.    Accordingly, when the government "compel[s] individuals to speak a particular message" over their objection, "such notices alter the content of their speech" and therefore trigger heightened scrutiny. *Id.* at 782 (brackets and internal quotation marks omitted); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 586-87 (2023) ("Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include. All that offends the First Amendment just the same." (citations omitted)).

270.    The Monthly Report Requirement impermissibly compels Airbnb's speech by requiring it to create and submit monthly reports divulging sensitive business data. This is not commercial speech. As the Supreme Court has explained, commercial speech is "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (internal quotation marks omitted). The sensitive information that Airbnb is required to disclose does not propose commercial transactions.

271.    The Monthly Report Requirement is a content-based regulation because it obligates covered entities to speak on particular topics—*i.e.*, the ten monthly disclosure categories, plus any other data the County demands at its discretion—but not others.

272.    Accordingly, the Monthly Report Requirement is subject to strict scrutiny, and cannot meet that exacting standard. It is not justified by a compelling government interest, nor is it narrowly drawn to serve any such interest. No compelling government interest can be served by

requiring Airbnb to divulge, on a monthly basis, each of the ten categories of information covered by the Monthly Report Requirement on *all Clark County listings*, plus whatever other data the County decides to demand. And even if the Defendants could identify a compelling interest, there are undoubtedly less restrictive means they could employ to serve that interest.

**COUNT XX**
**<u>Violation of and Preemption by Section 230 of the Communications Act</u>**
**<u>47 U.S.C. § 230; 42 U.S.C. § 1983</u>**
**By Airbnb against All Defendants**

273.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

274.    In enacting Section 230 of the Communications Act, Congress sought to protect and nurture the internet as a forum for communication, expression, and e-commerce. Section 230 prohibits treating websites that host or distribute third-party content, like Airbnb, "as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230 also preempts incompatible state and local laws that would seek to assign liability to platforms. *Id.* § 230(e)(3).

275.    Airbnb is a provider of an "interactive computer service" protected by Section 230, because it provides computer access by multiple users to a computer server through its maintenance of the Airbnb platform. *Id.* § 230(f)(2). Third-party hosts on the Airbnb platform are "information content providers" within the meaning of Section 230, because they alone are responsible for the creation of listings on Airbnb. *Id.* § 230(f)(3). Hosts and guests alone, not Airbnb, decide whether and on what terms to enter into transactions.

276.    The Verification Requirements violate and conflict with Section 230. These provisions demand that Airbnb (1) "verify" that each short-term rental "has been issued a valid unexpired short-term rental license" "[b]efore listing or advertising the property," prohibiting the

publication of unlicensed properties and requiring Airbnb to confirm the validity of licenses, (2) "[d]eactivate all listings which lack a valid state or county business license number," effectively mandating the deletion of such listings, and (3) refrain from "accept[ing] or facilitat[ing] the payment" of an unlicensed short-term rental, again effectively demanding the deletion of unlicensed listings. *See* Clark County Code §§ 7.110.080(a), (c), 7.110.090. Moreover, the Code, pursuant to AB 363, further requires that Airbnb "deactivate" any listing upon the County's request that it "remove" any listing. *Id.* § 7.110.080(c).

277. By forcing Airbnb to engage in decisions relating to publishing, monitoring, and deleting listings created by third-party hosts, the Verification Requirements and other deactivation demands treat Airbnb as a publisher of this content, in violation of Section 230. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (regulations that "necessarily require an internet company to monitor third-party content" or "otherwise affect[s] how [it] publishes or monitors user content" implicate Section 230 (citation omitted)); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016) (demanding a website to remove third-party content "would treat the website as the publisher of user content because removing content is something publishers do" and "to permit liability for such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove" (citation omitted)).

278. The Challenged Provisions constitute "State or local law[s] that [are] inconsistent with" Section 230, in violation of 47 U.S.C. § 230(e)(3), and therefore the enforcement of the Challenged Provisions against Airbnb violates and is preempted by Section 230.

///

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

1.      Declaring that the Challenged Provisions constitute a taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution, entitling Plaintiffs to an award of just compensation;

2.      Declaring that the Challenged Provisions constitute a taking in violation of Article 1, Section 8(3) of the Nevada Constitution, entitling Plaintiffs to an award of just compensation;

3.      Declaring that Clark County Code § 7.100.170(o) constitutes a taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution, entitling Plaintiffs to an award of just compensation;

4.      Declaring that Clark County Code § 7.100.170(r) constitutes a taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution, entitling Plaintiffs to an award of just compensation;

5.      Declaring that the Challenged Provisions violate the Fourteenth Amendment to the United States Constitution;

6.      Declaring that the Challenged Provisions violate Article 1, Section 8(5) of the Nevada Constitution;

7.      Declaring that the Surveillance Provisions violate the Fourth Amendment to the United States Constitution;

8.      Declaring that the Surveillance Provisions violate Article 1, Section 18 of the Nevada Constitution;

9.      Declaring that the Challenged Provisions violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

10.     Declaring that the Buffer Provisions violate Article 4, Section 21 of the Nevada Constitution;

11.     Declaring that the Fine Provisions violate the Eighth Amendment to the United States Constitution;

12.     Declaring that the Fine Provisions violate Article I, Section 6 of the Nevada Constitution;

13.     Declaring that the Monthly Report Requirement violates the Fourth Amendment to the United States Constitution;

14.     Declaring that the Monthly Report Requirement violates Article 1, Section 18 of the Nevada Constitution;

15.     Declaring that the Monthly Report Requirement violates and is preempted by the Stored Communications Act;

16.     Declaring that the Monthly Report Requirement violates the First Amendment;

17.     Declaring that the Verification Requirements violate the Fourth Amendment to the United States Constitution;

18.     Declaring the Verification Requirements and other deactivation requirements violate and are preempted by Section 230 of the Communications Act;

19.     Enjoining Defendants, their agents, officers, employees, and successors, and all persons acting in concert with him, from enforcing any of the Challenged Provisions;

20.     Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

///

21.    Granting any such other and further relief as this Court deems just and proper.

Dated this 30th day of June, 2025.

HUTCHISON & STEFFEN, PLLC


/s/Shannon R. Wilson
Mark A. Hutchison (4639)
Shannon R. Wilson (9933)
Ramez Ghally (15225)
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, NV 89145
Tel:  (702) 385-2500
Fax:  (702) 385-2086
mhutchison@hutchlegal.com
swilson@hutchlegal.com
rghally@hutchlegal.com

Paul D. Clement (Virginia Bar No. 37915)
*Pro Hac Vice Pending*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Tel:  (202) 742-8900
paul.clement@clementmurphy.com

*Attorneys for Plaintiffs*